# EXHIBIT A

Dockets.Justia.com

1

2    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF CALIFORNIA
3    SAN JOSE DIVISION
     ------------------------------------x
4    CLRB HANSON INDUSTRIES, LLC d/b/a
     INDUSTRIAL PRINTING, and HOWARD
5    STERN, on behalf of themselves and
     all others similarly situated,
6
                           Plaintiffs,
7
                    v.                        Case No.
8                                             05-03639 JW
     GOOGLE, INC.,
9                                             Confidential
                                              Portions Bound
10                         Defendant.         Separately
     ------------------------------------x
11                         August 18, 2006

12                         9:45 a.m.

13

14            30(b)(6) VIDEOTAPED DEPOSITION

15        of CLRB HANSON INDUSTRIES d/b/a

16        INDUSTRIAL PRINTING by BRETT R. HANSON,

17        taken by Defendant, pursuant to notice,

18        held at the offices of Thacher Proffitt

19        & Wood, 2 World Financial Center, New

20        York, New York, before Amy E. Sikora,

21        CRR, CSR, RPR, Certified Realtime

22        Reporter, Certified Shorthand Reporter,

23        Registered Professional Reporter, and

24        Notary Public within and for the State

25        of New York.

                           1

BARKLEY
Court Reporters

|          |    |                                          |
|----------|----|------------------------------------------|
|          | 1  | B. Hanson                                |
| 10:11    | 2  | program?                                 |
| 10:11    | 3  | A.    Yes, sir.                          |
| 10:11    | 4  | Q.    And you'd heard about it in some   |
| 10:11    | 5  | fashion, I take it?                      |
| 10:11    | 6  | A.    Correct.                           |
| 10:11    | 7  | Q.    Do you remember how you'd heard    |
| 10:11    | 8  | about it?                                |
| 10:11    | 9  | A.    Well, I subscribe to various       |
| 10:11    | 10 | informational newsletters from various   |
| 10:11    | 11 | sources, and I may have come across it as an |
| 10:11    | 12 | advertisement on the right or left-hand side, |
| 10:11    | 13 | and I may have clicked it.  And I don't  |
| 10:11    | 14 | recall exactly how I got to the Google site, |
| 10:11    | 15 | but...                                   |
| 10:11    | 16 | Q.    Somehow you were there?            |
| 10:11    | 17 | A.    I got there.                       |
| 10:11    | 18 | Q.    Okay.  And then -- this was on a   |
| 10:11    | 19 | PC, I take it?                           |
| 10:11    | 20 | A.    Yes, sir.                          |
| 10:11    | 21 | Q.    Okay.  And how many PC's, if you   |
| 10:12    | 22 | know, have you used to place ads on the  |
| 10:12    | 23 | Google AdWords program?                  |
| 10:12    | 24 | A.    I have no idea.                    |
| 10:12    | 25 | Q.    More than 10?                      |

24

BRETT R. HANSON

BARKLEY
Court Reporters

B. Hanson

10:12  2  A.    Yes.

10:12  3  Q.    More than 20, you think?

10:12  4  A.    Yes.

10:12  5  Q.    And how long did it take for you

10:12  6  to go through the sign-up process for the

10:12  7  AdWords program?

10:12  8  A.    As I recall, I think I was quite

10:12  9  amazed at how quick it was. Less than a

10:12  10  minute, I believe.

10:12  11  Q.    And was it a situation where you

10:12  12  actually looked at the site and saw how the

10:12  13  sign-up process worked and said, I'm going to

10:12  14  sign up later or this intrigues me, or you

10:12  15  just went to the site and then immediately

10:12  16  signed on?

10:12  17  A.    I went to the site. I believe I

10:12  18  immediately signed on, and --

10:13  19  Q.    Okay. And do you remember at

10:13  20  some point in time during the sign-in process

10:13  21  you were asked for --

10:13  22  MR. BIDERMAN:  Withdraw the

10:13  23  question.

10:13  24  Q.    At some point in time in the

10:13  25  sign-in process you were asked for certain

25

BARKLEY
Court Reporters

B. Hanson

| | | |
|---|---|---|
| 10:13 | 1 | |
| 10:13 | 2 | information; correct? |
| 10:13 | 3 | A.      Yes, sir. |
| 10:13 | 4 | Q.      Can you describe, as best as you |
| 10:13 | 5 | can recall, the information that you were |
| 10:13 | 6 | asked for and the order in which you provided |
| 10:13 | 7 | the information? |
| 10:13 | 8 | A.      Initially, it was -- the |
| 10:13 | 9 | initial, what I recall, was an e-mail |
| 10:13 | 10 | address, a password, a credit card number, |
| 10:13 | 11 | and -- and an initial campaign name and |
| 10:14 | 12 | campaign keywords.  Keywords associated with |
| 10:14 | 13 | the campaign.  A daily budget dollar amount, |
| 10:14 | 14 | and the maximum we were willing to pay per |
| 10:14 | 15 | click for the various keywords associated |
| 10:14 | 16 | with a campaign name. |
| 10:14 | 17 | Q.      And do you remember that at some |
| 10:14 | 18 | point in time the terms and conditions for |
| 10:14 | 19 | the AdWords program appeared on your screen? |
| 10:14 | 20 | A.      No, sir. |
| 10:14 | 21 | Q.      Let me show you a document which |
| 10:14 | 22 | I'll mark as next in order. |
| 11:18 | 23 | (Exhibit No. 22, three-page |
| 11:18 | 24 | document entitled Google AdWords, |
| 11:18 | 25 | Google AdWords Select Standard Terms |

26

BRETT R. HANSON

BARKLEY
Court Reporters

|       |    | B. Hanson |
|-------|----|-----------|
| 11:18 | 2  | and Conditions, marked for |
| 11:18 | 3  | identification as of this date.) |
| 10:15 | 4  | Q.     I show you a document which is |
| 10:16 | 5  | Exhibit 22.  It's a three-page document |
| 10:16 | 6  | entitled "Google AdWords, Google AdWords |
| 10:16 | 7  | Select Standard Terms and Conditions." |
| 10:16 | 8  | Do you see that document? |
| 10:16 | 9  | A.     Yes, sir. |
| 10:16 | 10 | Q.     I'll represent to you that this |
| 10:16 | 11 | was the document with the Google terms and |
| 10:16 | 12 | conditions as of July 2002.  Do you recall |
| 10:16 | 13 | seeing these terms and conditions at or about |
| 10:16 | 14 | the time that you signed on to the program? |
| 10:16 | 15 | A.     I do not. |
| 10:16 | 16 | Q.     And have you ever seen these |
| 10:16 | 17 | terms and conditions? |
| 10:16 | 18 | A.     Not that I can recall. |
| 10:16 | 19 | Q.     Have you ever seen any Google |
| 10:16 | 20 | AdWords terms and conditions? |
| 10:17 | 21 | A.     I have -- the most recent ones |
| 10:17 | 22 | that were submitted as -- as -- the documents |
| 10:17 | 23 | you provided. |
| 10:17 | 24 | Q.     Okay.  But other than in |
| 10:17 | 25 | connection with this litigation and documents |

27

BRETT R. HANSON

|       |    |                                              |
|-------|----|----------------------------------------------|
|       | 1  | B. Hanson                                    |
| 10:35 | 2  | and conditions in connection with that       |
| 10:35 | 3  | sign-up process?                             |
| 10:35 | 4  | A.      Can you ask that question again,     |
| 10:35 | 5  | please.                                      |
| 10:35 | 6  | Q.      Sure.  Trying to identify the        |
| 10:35 | 7  | time you signed up on behalf of -- I         |
| 10:35 | 8  | mispronounce the name of that.               |
| 10:35 | 9  | MR. LEVY:  SECOA.                            |
| 10:35 | 10 | A.      I'll pronounce it for you.  It's     |
| 10:35 | 11 | SECOA, S-E-C-O-A.                            |
| 10:35 | 12 | Q.      Not like the tree.  I keep           |
| 10:35 | 13 | thinking about the tree.                     |
| 10:35 | 14 | A.      SECOA.                               |
| 10:35 | 15 | Q.      SECOA.  On behalf of SECOA,          |
| 10:36 | 16 | going back to that time, any recollection of |
| 10:36 | 17 | reviewing the terms and conditions for the   |
| 10:36 | 18 | AdWords program at that time?                |
| 10:36 | 19 | A.      Not that I recall.                   |
| 10:36 | 20 | Q.      Okay.  And at that time did          |
| 10:36 | 21 | you -- did you in some manner electronically |
| 10:36 | 22 | signify your acceptance to the AdWords terms |
| 10:36 | 23 | and conditions when you signed up for SECOA? |
| 10:36 | 24 | A.      Can you ask that question again,     |
| 10:36 | 25 | please.                                      |

41

BRETT R. HANSON

BARKLEY
Court Reporters

B. Hanson

10:36  2    Q.    Sure.  At the time that you

10:36  3  signed up for SECOA --

10:36  4              MR. BIDERMAN:  Off the record.

10:36  5              (Discussion off the record.)

10:37  6    Q.    Going back to the time that you

10:37  7  signed up for secoa.com, do you remember in

10:37  8  any fashion electronically signifying that

10:37  9  you accepted the terms and conditions of the

10:37  10  AdWords program?

10:37  11      A.    I recall one time a screen came

10:37  12  up that denied access to our account, to the

10:37  13  CLRB account.  And it said that there were

10:37  14  new terms and conditions.  And if you wanted

10:37  15  to use -- continue use of the AdWords

10:37  16  programs you had to agree to the terms and

10:37  17  conditions.

10:37  18      Q.    Okay.

10:37  19      A.    And you didn't get past that

10:37  20  screen once you typed in your user name and

10:37  21  your password.

10:38  22      Q.    Okay.  And then what happened

10:38  23  after you hit that screen that denied you

10:38  24  access?

10:38  25      A.    It -- it gave you a link to, I

42

BARKLEY
Court Reporters

1           B. Hanson

10:38    2    believe, review and/or accept the terms and

10:38    3    conditions.

10:38    4        Q.      And did you hit that link?

10:38    5        A.      Yes, sir.

10:38    6        Q.      And did you review the terms and

10:38    7    conditions?

10:38    8        A.      No, sir.

10:38    9        Q.      Did you accept them?

10:38    10       A.      Yes, sir.

10:38    11       Q.      And do you remember when that

10:38    12   happened?

10:38    13       A.      I don't.  I want to say it

10:38    14   was -- I recall it was -- I want to say it

10:38    15   was like in the April to June of 2005 period.

10:38    16       Q.      And did that happen at any other

10:38    17   time?

10:38    18       A.      Not that I -- I remember that

10:38    19   because I was going in to make a change in

10:38    20   the budget.  Not that I recall.

10:38    21       Q.      And then going back to SECOA,

10:39    22   when you signed up for SECOA, do you remember

10:39    23   in some fashion electronically signifying

10:39    24   your acceptance to the terms and conditions

10:39    25   as part of the sign-up process for the Google

43

BARKLEY
Court Reporters

1           B. Hanson

10:39    2   AdWords program?

10:39    3       A.    I don't recall.

10:39    4       Q.    And when you say you don't

10:39    5   recall, are you saying you believe it didn't

10:39    6   happen or you just don't remember one way or

10:39    7   the other?

10:39    8       A.    I don't remember one way or

10:39    9   another.

10:39   10       Q.    And the same with respect to --

10:39   11   and other than what you described in

10:39   12   connection with the sign-up process for

10:39   13   Industrial Printing, anything else that you

10:39   14   remember -- you remember being different when

10:39   15   you signed up with respect to SECOA?

10:40   16       A.    No, sir.

10:40   17       Q.    And how about Hanson Industries,

10:40   18   when you signed up for the Google AdWords

10:40   19   program on behalf of Hanson Industries, same

10:40   20   process?

10:40   21       A.    I don't -- I don't believe I was

10:40   22   the one that signed up for the AdWords

10:40   23   program for Hanson Industries.

10:40   24       Q.    Okay.

10:40   25       A.    I'm -- I'm -- I don't believe I

44

BARKLEY
Court Reporters

1                    B. Hanson

10:40    2    was.

10:40    3        Q.     Do you know who did that?

10:40    4        A.     I believe, Cindy Hanson, the

10:40    5    owner, manager.

10:40    6        Q.     And with respect to your

10:40    7    understanding of what terms and conditions

10:40    8    govern your relationship with SECOA, Inc. or

10:40    9    you on behalf of SECOA, Inc. and the Google

10:40    10   AdWords program, is that the same as your

10:40    11   understanding as described with respect to

10:40    12   Industrial Printing?

10:40    13       A.     Yes, sir.

10:41    14       Q.     And the same would be true of

10:41    15   Hanson Industries?

10:41    16       A.     I believe that to be correct,

10:41    17   yes.

10:41    18       Q.     And with respect to -- let me

10:41    19   just back up.  Have you ever looked at any of

10:41    20   the FAQ's associated with the Google AdWords

10:41    21   program?

10:41    22       A.     Not -- not -- not -- not that --

10:41    23   I may have -- not that I recall.

10:41    24       Q.     And have you ever looked at any

10:42    25   tutorials for the Google AdWords program?

45

BRETT R. HANSON

BARKLEY
Court Reporters

```
                              B. Hanson
  1
10:42    2       A.       No, sir.

10:42    3       Q.       Have you ever consulted with

10:42    4   anyone other than at Google about how to use

10:42    5   the AdWords program?

10:42    6       A.       No, sir.

10:42    7       Q.       In other words, you haven't

10:42    8   taken any courses on like optimization or

10:42    9   anything like that?

10:42   10       A.       No, sir.

10:42   11       Q.       No -- no training in how to use

10:42   12   the AdWords program, is that fair to say,

10:42   13   formal training?

10:42   14       A.       No, sir.  May I qualify that

10:42   15   answer?

10:42   16       Q.       Sure, absolutely.

10:42   17       A.       I want to add to that.

10:42   18       Q.       Sure.

10:42   19       A.       There was a program that Google

10:42   20   introduced in November of 2004 called AdWords

10:42   21   Pro that allowed you to sign up to become a,

10:43   22   quote, AdWords pro.  And I signed up for it

10:43   23   but I never did -- never proceeded past the

10:43   24   initial sign-up page.

10:43   25       Q.       Okay.
```

46

BRETT R. HANSON

BARKLEY
Court Reporters

```
             1              B. Hanson
10:44        2          MR. BIDERMAN:  We've been going
10:44        3      about an hour.  Do you want to take
10:44        4      like four, five minutes?
10:44        5          MR. LEVY:  Sure.
10:44        6          THE VIDEOGRAPHER:  The time is
10:44        7      10:44 a.m.  We're off the record.
10:44        8          (Recess taken.)
10:55        9          THE VIDEOGRAPHER:  The time is
10:55       10      10:55 a.m.  We're back on the record.
23:59       11  BY MR. BIDERMAN:
10:55       12          Q.    And just one question while
10:55       13      we're getting a document.  With respect to
10:55       14      the daily budget, how -- what is your
10:55       15      understanding of how a daily budget works on
10:55       16      the Google AdWords program?
10:55       17          A.    That whatever our budget is
10:55       18      we'll not be charged more than that certain
10:55       19      amount.
10:55       20          Q.    Okay.  And how did you come to
10:55       21      that understanding?
10:55       22          A.    That's what was presented to me
10:55       23      by Google.
10:55       24          Q.    In what form?
10:55       25          A.    The on-line page.  The initial
```

47

BARKLEY
Court Reporters

|          |    | B. Hanson |
|----------|----|-----------|
| 10:56 | 1  | |
| 10:56 | 2  | page. |
| 10:56 | 3  | Q.      Okay.  And have you ever been |
| 10:56 | 4  | told that you can be charged up to |
| 10:56 | 5  | 120 percent of your daily budget on a given |
| 10:56 | 6  | day? |
| 10:56 | 7  | A.      I was told that by a |
| 10:56 | 8  | representative of Google in an e-mail. |
| 10:56 | 9  | Q.      Okay.  And other than that, have |
| 10:56 | 10 | you ever received that information? |
| 10:56 | 11 | A.      No, sir. |
| 10:56 | 12 | Q.      And I'll show you a document |
| 10:56 | 13 | which are the FAQ's that were operative as of |
| 10:57 | 14 | the time that you signed up for the AdWords |
| 10:57 | 15 | program.  We'll mark those next in order. |
| 10:57 | 16 | (Exhibit No. 23, FAQ's operative |
| 10:57 | 17 | as of the time Mr. Hanson signed up for |
| 10:57 | 18 | the AdWords programs, bearing Bates |
| 10:57 | 19 | Nos. 20835 through 21343, marked for |
| 10:57 | 20 | identification as of this date.) |
| 10:57 | 21 | Q.      23 are a series of documents |
| 10:57 | 22 | that are clipped together.  Bates number on |
| 10:57 | 23 | the first document is 20835.  Bates number on |
| 10:57 | 24 | the last document is 21343.  Mr. Hanson, I'd |
| 10:57 | 25 | ask you if you'd refer to the document which |

48

BARKLEY
Court Reporters

|         |    | B. Hanson |
|---------|----|-----------|
| 10:57   | 2  | is in the second clipped group, numbered |
| 10:58   | 3  | page 20904.  You have to look at the lower |
| 10:58   | 4  | right-hand side. |
| 10:58   | 5  | A.    20904? |
| 10:58   | 6  | Q.    Yeah.  Okay.  And do you see the |
| 10:58   | 7  | entry there under No. 2 that says, "Why did I |
| 10:58   | 8  | receive more clicks than my daily budget on a |
| 10:58   | 9  | particular day?" |
| 10:58   | 10 | A.    Yes. |
| 10:58   | 11 | Q.    And do you see where it says |
| 10:58   | 12 | "Traffic is not constant from day to day." |
| 10:58   | 13 | Do you see that? |
| 10:59   | 14 | A.    Yes. |
| 10:59   | 15 | Q.    And it says, "For example, fewer |
| 10:59   | 16 | people search the web on weekends than during |
| 10:59   | 17 | the week.  To account for this and maximize |
| 10:59   | 18 | the potential of your advertising, Google may |
| 10:59   | 19 | allow up to 20 percent more clicks in one day |
| 10:59   | 20 | than your daily budget specifies." |
| 10:59   | 21 | Do you see that? |
| 10:59   | 22 | A.    Yes. |
| 10:59   | 23 | Q.    Have you ever seen that language |
| 10:59   | 24 | before? |
| 10:59   | 25 | A.    Only in the documents that were |

49

BRETT R. HANSON

BARKLEY
Court Reporters

B. Hanson

1

11:24  2

11:24  3

11:24  4

11:24  5

11:24  6

11:24  7

11:24  8

11:24  9     A.    No, sir.  No street drugs.

11:24  10  Never -- never used any street drugs of any

11:24  11  sort.  I had cervical spinal fusion

11:24  12  January 4th of this year on my neck, and

11:24  13  perhaps used just a daily budget while I was

11:25  14  under some pain medication during that period

11:25  15  for a couple of weeks while I recovered.  I

11:25  16  had four disks fused in my neck.  But other

11:25  17  than that, no.

11:25  18     Q.    Then going back, what I'm going

11:25  19  to do -- going back to the daily budget

11:25  20  issues, at some point in time did you

11:25  21  become --

11:25  22     MR. BIDERMAN:  Withdraw the

11:25  23    question.

11:25  24     Q.    At some point in time did you --

11:26  25  let me try another question.

68

BRETT R. HANSON

BARKLEY
Court Reporters

```
  1                      B. Hanson
11:26  2              How often did you look at the
11:26  3     billing information on your Google AdWords
11:26  4     program?
11:26  5          A.     Just about daily.
11:26  6          Q.     Okay.  And when you say the
11:26  7     billing information, what pages did you
11:26  8     review?
11:26  9          A.     The summary that indicated what
11:26  10    was charged against the daily budget.
11:26  11         Q.     And how do you access that
11:26  12    summary?
11:26  13         A.     Sign in with a user name,
11:26  14    password, and go to billing history.
11:26  15         Q.     And so has it been your practice
11:26  16    since you signed up for the program to look
11:26  17    at that on a daily basis?
11:26  18         A.     Just about, yes, sir.
11:26  19         Q.     And how about pausing, have you
11:26  20    ever paused using the Google AdWords program?
11:27  21         A.     Yes.
11:27  22         Q.     When did you first start to
11:27  23    pause?
11:27  24         A.     I believe almost immediately.
11:27  25         Q.     Okay.  And -- go ahead.  Did I
```

69

BRETT R. HANSON

BARKLEY
Court Reporters

```
                            B. Hanson
 1
11:27   2    interrupt you?  And what -- what caused you
11:27   3    to use the pausing feature?
11:27   4         A.    It's a unique selling feature
11:27   5    allowing you to turn off and on your costs.
11:27   6    Having more ability to control the costs
11:27   7    associated with your pay-for-click
11:27   8    advertising.  I thought that was an asset of
11:27   9    Google's that others did not have.
11:27  10         Q.    Okay.  And what did you use the
11:27  11    pausing feature to accomplish?
11:27  12         A.    That was my cost certain.  If I
11:27  13    had a daily budget of $100 and my costs at
11:27  14    that certain time were -- were, as an
11:27  15    example, $52 to my $100 budget, I wasn't
11:27  16    going to spend more than $52 that day,
11:28  17    period.
11:28  18         Q.    So could you give me an example
11:28  19    of how you would implement that pausing?
11:28  20         A.    Just go in and click.  There's a
11:28  21    button that says, "Pause."
11:28  22         Q.    Okay.  But you said you'd look
11:28  23    at your billing summary; right?
11:28  24         A.    Look at my daily budget, that's
11:28  25    on one page.  You've got your campaign name,
```

70

BARKLEY
Court Reporters

|        |    | B. Hanson |
|--------|----|-----------|
| 13:12  | 2  | Bates stamp P0507 by quarter. |
| 13:13  | 3  | Q.    Uh-huh. |
| 13:13  | 4  | A.    And there, looking to the far -- |
| 13:13  | 5  | far right, we've got the overcharge |
| 13:13  | 6  | percentage, and immediately to the left of |
| 13:13  | 7  | that is a number of what we were overcharged |
| 13:13  | 8  | on a daily basis cumulative per quarter.  And |
| 13:13  | 9  | the total -- the totals is marked as |
| 13:13  | 10 | $16,507.27. |
| 13:13  | 11 | Q.    Okay.  And that was a separate |
| 13:13  | 12 | calculation that you did with a spreadsheet? |
| 13:13  | 13 | A.    Well, it's summarizing what's |
| 13:13  | 14 | highlighted by quarter up above. |
| 13:13  | 15 | Q.    Okay. |
| 13:13  | 16 | A.    So each one of these, if you |
| 13:13  | 17 | look at the fourth quarter 2005. |
| 13:13  | 18 | Q.    Yes. |
| 13:13  | 19 | A.    The last column says 15,810, |
| 13:13  | 20 | 10,051.20, and a negative $596.30.  When |
| 13:14  | 21 | there appears to be a negative number, that's |
| 13:14  | 22 | what we have been overcharged. |
| 13:14  | 23 | Q.    Okay.  And when you came up with |
| 13:14  | 24 | a quarter budget, how did you do that? |
| 13:14  | 25 | A.    That's just -- the quarter |

119

BRETT R. HANSON

BARKLEY
Court Reporters

1           B. Hanson

13:14    2    budget is just a function of summarizing

13:14    3    the -- the totals.  It has no meaning to

13:14    4    what -- what I was trying to do here.

13:14    5        Q.    The quarter budget totals up the

13:14    6    daily budget?

13:14    7        A.    Right.

13:14    8        Q.    Times the number of days in a

13:14    9    quarter?

13:14    10       A.    Right.

13:14    11       Q.    And have you ever tried to do

13:14    12   this on a monthly basis?

13:14    13       A.    No, I have not.

13:14    14       Q.    And do you know whether, if you

13:14    15   did this on a monthly basis, whether the

13:14    16   total budget, that would be the number of

13:15    17   days in the month times the daily budget,

13:15    18   would be more or less than the total charges?

13:15    19       A.    I don't know what -- I don't

13:15    20   know what a monthly budget is to Google for

13:15    21   me for the purposes of this, because I work

13:15    22   from a daily budget.

13:15    23       Q.    I didn't use the term "monthly

13:15    24   budget."  I said do you know whether on a

13:15    25   monthly basis, if you took the total number

120

BARKLEY
Court Reporters

1         B. Hanson

13:15    2    of days in the month, multiplied that by the

13:15    3    daily budget, do you know whether that amount

13:15    4    would exceed the total cost for that

13:15    5    particular number of days?

13:15    6         A.    I do not.

13:16    7         Q.    So is it your belief, based on

13:16    8    your interpretation of your legal

13:16    9    relationship with Google, that during the

13:16    10   period specified, 7/31/02 through 11/2/05,

13:16    11   that you paid $16,507.27 more than you should

13:16    12   have?

13:16    13        A.    Yes, sir.

13:17    14        Q.    And there are some instances,

13:17    15   for example, looking at page 43 of 56 or

13:17    16   Bates No. 0494 --

13:17    17        A.    Okay.

13:17    18        Q.    -- there are some instances

13:17    19   where the percent column, the overcharge

13:17    20   percentage, the second to the right, is in

13:17    21   excess of 20 percent; do you see those?

13:17    22        A.    Yes.

13:17    23        Q.    For example, February 24, 2005,

13:17    24   it's listed as being 51 percent?

13:17    25        A.    Yes.

121

BARKLEY
Court Reporters

B. Hanson

| | |
|---|---|
| 13:18 | 1 |
| 13:18 | 2 |

Q.      Do you know whether you received

overdelivery credits with respect to the

particular charges that were in excess of

20 percent of your daily budget?

A.      I do not believe we have.

Q.      And why do you have that

conclusion?

A.      I believe because I was able to

tie out -- I was able to tie out the -- the

total -- the total -- the total credit card

charge is 360, looking on page 56 of 56 or

P0507.

Q.      Yes.

A.      Totals and overall averages, I

believe I was able to tie that out.

Q.      And that total is 360737.02;

correct?

A.      Yes.  And that's what was

charged to Cindy's credit card.

Q.      Okay.  And did you provide the

credit card statements that you used?

A.      Yes.

Q.      Okay.  Why don't we just

identify those also, if we could.  They're in

122

BARKLEY
Court Reporters

|       |    |                                              |
|-------|----|----------------------------------------------|
|       | 1  | B. Hanson                                    |
| 13:23 | 2  | amount 360737.02 during the time period      |
| 13:23 | 3  | that's reflected on Exhibit 36?              |
| 13:23 | 4  | A.    This is part -- part of the            |
| 13:24 | 5  | documents, yes.                              |
| 13:24 | 6  | Q.    Okay.  And what were the other         |
| 13:24 | 7  | documents that you used?                     |
| 13:24 | 8  | A.    I haven't been able to locate          |
| 13:24 | 9  | the other credit card statements.            |
| 13:24 | 10 | Q.    And then --                            |
| 13:24 | 11 | A.    At the present time.                    |
| 13:24 | 12 | Q.    Okay.  And how were you able to        |
| 13:24 | 13 | conclude, without the other credit card      |
| 13:24 | 14 | statements, that in fact you were charged the|
| 13:24 | 15 | the roughly $360,000 amount?                  |
| 13:24 | 16 | A.    That's the report right from           |
| 13:24 | 17 | Google, what they charge -- that report's a  |
| 13:24 | 18 | summary of what Google actually charged the  |
| 13:24 | 19 | credit card.                                 |
| 13:24 | 20 | Q.    Is that your understanding?            |
| 13:24 | 21 | A.    Yes.                                    |
| 13:24 | 22 | Q.    And just to go back to my              |
| 13:24 | 23 | question, did you make any effort to look at |
| 13:24 | 24 | these credit card statements, which are      |
| 13:24 | 25 | Exhibit 37, and use them to somehow          |

125

BARKLEY
Court Reporters

1                          B. Hanson
13:25    2    understand whether you received any
13:25    3    overdelivery credits?
13:25    4            A.        I have not.
13:25    5            Q.        And did you go to the Google
13:25    6    AdWords web site and log on and retrieve
13:25    7    invoices from Google that corresponded to the
13:25    8    period that is reflected on Exhibit 36?
13:25    9            A.        I have not.
13:25    10           Q.        Any reason why not?
13:25    11           A.        I don't understand Google's
13:25    12   invoicing process.  I believe -- I just don't
13:25    13   understand how Google invoices.
13:25    14           Q.        And can you tell me what you've
13:25    15   done to try to understand Google's invoicing
13:26    16   process?
13:26    17           A.        Well, I've tried to foot -- I'd
13:26    18   tried to tie out an invoice to a credit card
13:26    19   statement -- a credit card charge.  I've
13:26    20   contacted via e-mail asking, I believe,
13:26    21   specifically of Google what's -- how they do
13:26    22   the billing, and that's the extent.
13:26    23           Q.        Have you spoken to anybody at
13:26    24   Google?
13:26    25           A.        I have.

                              126

BARKLEY
Court Reporters

1                           B. Hanson

13:26    2        Q.       On this particular subject?

13:26    3        A.       No, sir.

13:26    4        Q.       And what have you spoken to

13:26    5   people at Google about?

13:26    6        A.       The overcharges.

13:26    7        Q.       And we'll come to that.  And

13:27    8   other than the documents that we've talked

13:27    9   about thus far today, including Exhibit 36,

13:27   10   have you made any other efforts to try to

13:27   11   calculate what you believe are the

13:27   12   overcharges on the AdWords account for CLRB

13:27   13   Hanson?

13:27   14        A.       No, sir.

13:27   15        Q.       And have you ever made any such

13:27   16   effort on behalf of SECOA, Inc., that entity?

13:27   17        A.       No, sir.

13:27   18        Q.       And have you ever made any

13:27   19   efforts to do so on -- on behalf of Hanson

13:27   20   Industries?

13:27   21        A.       No, sir.

13:27   22        Q.       And then there's just a few more

13:28   23   documents.  If you take the ones that your

13:28   24   counsel provided to us last night, just to

13:28   25   make sure we've got everything.

127

BARKLEY
Court Reporters

B. Hanson

1

13:37   2    information.

13:37   3        A.     To verify that there were

13:37   4    overcharges.

13:37   5        Q.     And do you note that on

13:37   6    March 31, for example, Tina had communicated

13:37   7    to you that, and I'm looking on page 330, "As

13:38   8    I previously mentioned, charges accrued over

13:38   9    20 percent of your set daily budget will be

13:38   10   credited to your account at the end of the

13:38   11   month."

13:38   12            Do you see that?

13:38   13       A.     I do.

13:38   14       Q.     And have you -- do you have any

13:38   15   understanding about whether, in fact, charges

13:38   16   over 20 percent of your set daily budget are

13:38   17   in fact credited to your account?

13:38   18       A.     I do not.

13:38   19       Q.     In other words, you don't know

13:38   20   one way or the other whether they are?

13:38   21       A.     I don't believe they are.

13:38   22       Q.     Okay.  And why is that?

13:38   23       A.     Because I have with some

13:38   24   certainty tied out that the charges that were

13:38   25   reflected on the reports from Google servers

134

BRETT R. HANSON

BARKLEY
Court Reporters

1                    B. Hanson

13:38   2    to what was charged to our credit card match.

13:38   3    Google's own reports from their servers

13:38   4    verify my information.

13:38   5         Q.    And when you say, "Google's own

13:38   6    reports," you're referring to what exhibit?

13:39   7         A.    Exhibit 36.

13:39   8         Q.    Okay.  And that's the -- that's

13:39   9    the summary of information that's on your

13:39   10   AdWords page; correct?

13:39   11        A.    Right.  The only information on

13:39   12   Exhibit 37 -- 36, excuse me, that was added

13:39   13   was the subtraction from the daily budget to

13:39   14   the daily cost to come up with -- so we

13:39   15   took -- I took the numbers that Google

13:39   16   provided.

13:39   17        Q.    Right.  And, again, you haven't

13:39   18   tried to do that with the invoices, have you?

13:39   19        A.    I have not.

13:39   20        Q.    And looking at the

13:39   21   correspondence from Tina again on page 331,

13:39   22   on March 30, 2005, I'm looking at this e-mail

13:39   23   correspondence, it says, among other things

13:40   24   she states to you, "In general, we try to

13:40   25   keep your daily cost fluctuation to no more

                         135

BRETT R. HANSON

BARKLEY
Court Reporters

1                    B. Hanson

13:40    2   than 20 percent above your daily budget.  And

13:40    3   we make sure that within the 30-day billing

13:40    4   period you are never charged more than the

13:40    5   number of days in that billing period times

13:40    6   your daily budget."

13:40    7          Do you see that?

13:40    8      A.    Yes.

13:40    9      Q.    And did you understand her to be

13:40   10   communicating to you that in fact under the

13:40   11   Google AdWords program you could be charged

13:40   12   up to 120 percent of your daily budget per

13:40   13   day?

13:40   14      A.    Well, I dis -- I mean, I

13:40   15   disagreed with the e-mails that I -- that

13:40   16   I -- I disagreed with this -- this point.

13:40   17   There's one e-mail that's not -- that's not

13:40   18   in this document from one of Google's

13:40   19   representatives that said, well, if you don't

13:40   20   like our budget -- if you don't like the

13:40   21   budget running over at where you're at,

13:40   22   adjust your budget downward by 20 percent,

13:41   23   then you won't go over whatever your magical

13:41   24   number is.  So I --

13:41   25      Q.    So is it fair to say that at

136

BRETT R. HANSON

BARKLEY
Court Reporters

1          B. Hanson

13:41   2    some point in time you did understand that

13:41   3    whether you agreed with it or not, Google's

13:41   4    practice under the AdWords program was to

13:41   5    charge up to 120 percent of your daily

13:41   6    budget?

13:41   7         A.    Can you ask that question again,

13:41   8    please.

13:41   9         Q.    Is it fair to say that in some

13:41   10   point in time you did understand that,

13:41   11   whether you agreed with it or not, Google's

13:41   12   practice under the AdWords program was to

13:41   13   charge up to 120 percent of your daily

13:41   14   budget?

13:41   15        A.    Yes.

13:41   16        Q.    And when did you come to that

13:41   17   understanding?

13:41   18        A.    Well, as I'm becoming frustrated

13:41   19   with my -- with my dialogue with Google, my

13:42   20   exchange of e-mails back and forth.

13:42   21        Q.    Okay.  And was it sometime in

13:42   22   2002 that you came to that understanding?

13:42   23        A.    No.  Quite to the contrary.  If

13:42   24   you look at Exhibit 36, which is an

13:42   25   interesting point in itself, if you look on

137

BRETT R. HANSON

BARKLEY
Court Reporters

```
 1              B. Hanson
 2  page P0507, overcharges don't start, really,
 3  there's not a significant accumulation of
 4  daily problems until -- there's a small one
 5  in 2005, $50.52.  There was one -- that was
 6  in the first quarter of 2003.
 7          The second quarter of 2003
 8  there's --
 9          Q.    Sorry, can you slow down.  What
10  page are you on?
11          A.    Oh, I'm sorry.  P0507, the last
12  page.
13          Q.    Okay.
14          A.    It really didn't become a huge
15  concern from a dollars standpoint until the
16  first quarter -- second quarter of 2004.
17          Q.    And is that when you first
18  raised it with Google?
19          A.    Right around -- right around
20  that point, I believe, yes.
21          Q.    And is it fair to say that at
22  that point in time, during the course of
23  those communications --
24          A.    We had never gone over budget
25  before then.  At that point it was like every
```

138

BRETT R. HANSON

| | | |
|---|---|---|
| | 1 | B. Hanson |
| 13:43 | 2 | day we were going over budget. |
| 13:43 | 3 | Q.    Right.  I understand.  Is it |
| 13:43 | 4 | fair to say that at some time in the second |
| 13:43 | 5 | quarter of 2004 you came to the understanding |
| 13:43 | 6 | that it was Google's practice under the |
| 13:43 | 7 | AdWords program to charge up to 20 percent |
| 13:43 | 8 | above the specified daily budget amount for a |
| 13:43 | 9 | given day? |
| 13:43 | 10 | A.    No, sir.  No, sir. |
| 13:44 | 11 | Q.    Okay.  You did come to that |
| 13:44 | 12 | understanding at some point in time; right? |
| 13:44 | 13 | A.    That wasn't the question you |
| 13:44 | 14 | asked me. |
| 13:44 | 15 | Q.    Okay.  Okay.  Have you ever come |
| 13:44 | 16 | to an understanding that Google's policy and |
| 13:44 | 17 | practice under the AdWords program is to |
| 13:44 | 18 | charge up to 120 percent of the daily budget? |
| 13:44 | 19 | A.    As recently as -- I've kind of |
| 13:44 | 20 | caved in and gave in that that's how Google's |
| 13:44 | 21 | going to treat their advertisers, is going to |
| 13:44 | 22 | screw them by 20 percent in the last, let's |
| 13:44 | 23 | say, last June, 2005.  Because I wasn't |
| 13:44 | 24 | getting anywhere with asking them for, you |
| 13:44 | 25 | know, why is this happening.  It didn't |

139

BARKLEY
Court Reporters

|   | 1 | B. Hanson |
|---|---|---|
| 13:45 | 2 | matter what I changed the daily budget to, it |
| 13:45 | 3 | always went over. |
| 13:45 | 4 | Q.    Okay.  So it's fair to say you |
| 13:45 | 5 | came to that understanding sometime, say, |
| 13:45 | 6 | June 2005? |
| 13:45 | 7 | A.    Yes. |
| 13:45 | 8 | Q.    And with respect to Exhibits 39 |
| 13:45 | 9 | and 38, the communications with Tina, did you |
| 13:45 | 10 | speak to her by phone? |
| 13:45 | 11 | A.    I don't know if Google has |
| 13:45 | 12 | phones.  No.  E-mail. |
| 13:45 | 13 | Q.    And have you ever spoken to |
| 13:45 | 14 | anyone at Google by telephone? |
| 13:46 | 15 | A.    Recently, I believe, I received |
| 13:46 | 16 | a voicemail.  In fact, on Monday, thanking us |
| 13:46 | 17 | for our business from a Matt.  I don't know, |
| 13:46 | 18 | Matt something left on my voicemail. |
| 13:46 | 19 | Q.    And anything other than that |
| 13:46 | 20 | communication? |
| 13:46 | 21 | A.    Not that I can recall. |
| 13:46 | 22 | Q.    I thought -- have you ever |
| 13:46 | 23 | spoken to anyone by phone or otherwise at |
| 13:46 | 24 | Google about daily budget issues? |
| 13:46 | 25 | A.    I think I -- let me refresh my |

140

BRETT R. HANSON

B. Hanson

13:46    2    memory here on what my answer just previously

13:46    3    to that. I think I spoke to a Bethanie back

13:46    4    in 2005.

13:46    5         Q.      Okay.

13:46    6         A.      That would have been January of

13:46    7    2005.

13:46    8         Q.      And how come you know it was

13:46    9    January 2005?

13:47    10        A.      I just -- I recall that in my

13:47    11    head. I don't remember why I remember that,

13:47    12    but I remember.

13:47    13        Q.      Okay. And then --

13:47    14        A.      Well, I was helping a friend

13:47    15    move from Mississippi, so I remember being in

13:47    16    the car talking on my cell phone talking

13:47    17    about -- talking to Bethanie about why the

13:47    18    budget kept going over.

13:47    19        Q.      Okay. And did you call her or

13:47    20    did she call you?

13:47    21        A.      I believe she was responding to

13:47    22    an e-mail that I may have requested her to

13:47    23    send to me or requested her to call me.

13:47    24        Q.      Okay. And as best as you can

13:47    25    recall, what did she say to you and what did

141

BARKLEY
Court Reporters

|       |    |                                          |
|-------|----|------------------------------------------|
|       | 1  | B. Hanson                                |
| 14:40 | 2  | this is from me or not.                  |
| 14:40 | 3  | Q.      Have you ever been told by       |
| 14:40 | 4  | Google that you needed to refine your keyword |
| 14:40 | 5  | list?                                    |
| 14:40 | 6  | A.      I do not believe so.             |
| 14:41 | 7  | Q.      If you look under tab 95,        |
| 14:41 | 8  | please.                                  |
| 14:41 | 9  | A.      Okay.                            |
| 14:41 | 10 | Q.      If you turn to page 6 of 33.     |
| 14:41 | 11 | You see this is a series of e-mail strings; |
| 14:41 | 12 | correct?                                 |
| 14:41 | 13 | A.      Yes.                             |
| 14:41 | 14 | Q.      And the e-mail that actually     |
| 14:41 | 15 | begins on page 5 of 33 at the very bottom |
| 14:41 | 16 | says, "From Brett Hanson, g-mail.        |
| 14:41 | 17 | Overbilling based on bugjet," B-U-G-J-E-T. |
| 14:42 | 18 | "Why," W-H-Y, question mark.  And is this an |
| 14:42 | 19 | e-mail that you wrote?                    |
| 14:42 | 20 | A.      It appears to be, yes.           |
| 14:42 | 21 | Q.      And it looks as if the format    |
| 14:42 | 22 | got lost.  Do you remember what format you |
| 14:42 | 23 | were sending -- what format you were using |
| 14:42 | 24 | and what information you were sending?    |
| 14:42 | 25 | A.      Just cutting and pasting the     |

168

BARKLEY
Court Reporters

B. Hanson

14:42  2   screen from the Google report.

14:42  3        Q.     And was it the daily Google

14:42  4   report?

14:42  5        A.     I don't remember.

14:42  6        Q.     And in response to this, if you

14:42  7   look at page 5 of 33, actually, 6 of 33,

14:43  8   there's -- I'm sorry, 4 of 33, there's an

14:43  9   e-mail that begins, "Hello, Brett.  It was a

14:43  10  pleasure speaking with you today.  I've

14:43  11  included additional information below

14:43  12  regarding how our system deals with

14:43  13  overdelivery charges."

14:43  14        Do you see that?

14:43  15        A.     Yes.

14:43  16        Q.     And then going to 5 of 33, you

14:43  17  were told, "We try keep your daily cost

14:43  18  fluctuation to no more than 20 percent above

14:43  19  your daily budget."

14:43  20        Do you recall receiving that

14:43  21  information?

14:43  22        A.     I don't remember.

14:43  23        Q.     Any reason to doubt that you

14:43  24  didn't receive this e-mail?

14:43  25        A.     I don't doubt it, no.

BARKLEY
Court Reporters

B. Hanson

14:43   2    Q.    And then there you were also
14:43   3    told, "We make sure that within a 30-day
14:43   4    billing period you are never charged more
14:43   5    than the number of days in that billing
14:44   6    period times your daily budget."
14:44   7          Do you see that?
14:44   8    A.    I do see that.
14:44   9    Q.    And is it fair to say that by
14:44   10   this time, March of '05, you understood that
14:44   11   at least Google's practice was to charge no
14:44   12   more than 20 percent above your daily budget?
14:44   13   A.    Must have been, yes.  If I
14:44   14   misspoke before, I'll correct my answer to
14:44   15   approximately March.
14:44   16   Q.    And then if you look at page 4
14:44   17   of 33, at the top there's an e-mail from
14:44   18   AdWords support, "Hello, Brett."  It states,
14:44   19   "I understand that you accrued charges over
14:44   20   your daily budget again yesterday.  I
14:44   21   apologize for any inconvenience caused by
14:44   22   this overdelivery.  At this time, please feel
14:45   23   free to reduce your daily budget in order to
14:45   24   decrease the overall charges you accrue this
14:45   25   week.  However, as I previously mentioned,

170

BARKLEY
Court Reporters

1               B. Hanson

14:45   2    charges accrued over 20 percent over your set

14:45   3    daily budget will be credited to your account

14:45   4    at the end of the month."

14:45   5           Does that refresh your

14:45   6    recollection of a conversation with somebody

14:45   7    at Google?

14:45   8       A.    I remember this e-mail because I

14:45   9    thought it was a preposterous e-mail.

14:45  10       Q.    And why did you believe it was a

14:45  11    preposterous e-mail?

14:45  12       A.    Well, to tell me to adjust my

14:45  13    budget downward.  Basically, the way I read

14:45  14    this, it's telling me to reduce my daily

14:45  15    budget so I don't go over my set budget.  I

14:45  16    mean, what's the point?

14:45  17       Q.    And do you also recall being

14:45  18    told --

14:45  19       A.    I turn my budget off and on.

14:45  20    Pardon me.  I pause the campaign.  I turn the

14:45  21    campaign back on.  I pause the campaign.  I

14:45  22    turn the campaigns on.  So what

14:45  23    constitutes -- in my opinion, the daily

14:45  24    budget's the set amount that I say it is, not

14:45  25    what Google says over 30 days.

BRETT R. HANSON

BARKLEY
Court Reporters

|       | 1  | B. Hanson |
|-------|----|-----------|
| 14:46 | 2  | Q.    And so you understood, as of |
| 14:46 | 3  | March 31, 2005, that you disagreed with the |
| 14:46 | 4  | way Google interpreted -- |
| 14:46 | 5  | A.    This is not -- |
| 14:46 | 6  | MR. LEVY:  Let him finish the |
| 14:46 | 7  | question. |
| 14:46 | 8  | MR. BIDERMAN:  Let me withdraw |
| 14:46 | 9  | the question. |
| 14:46 | 10 | MR. LEVY:  Again, let him finish |
| 14:46 | 11 | the question. |
| 14:46 | 12 | Q.    Going back to this e-mail.  And |
| 14:46 | 13 | then you recall you were also told that |
| 14:46 | 14 | anything over 20 percent would be credited to |
| 14:46 | 15 | your account at the end of the month? |
| 14:46 | 16 | A.    I believe so. |
| 14:46 | 17 | Q.    And then other than what we've |
| 14:46 | 18 | discussed thus far today, have you ever done |
| 14:46 | 19 | anything to look for those credits? |
| 14:46 | 20 | A.    Only in my -- in the most rawest |
| 14:46 | 21 | form of calculation.  I've taken -- I've |
| 14:46 | 22 | taken a look at what our daily budget is, |
| 14:47 | 23 | going back to Exhibit 36. |
| 14:47 | 24 | Q.    Yup. |
| 14:47 | 25 | A.    In the rawest form.  That was |

BRETT R. HANSON

BARKLEY

1                    B. Hanson

14:47   2    the only way I could really understand -- get

14:47   3    my hands around what we were overcharged.   I

14:47   4    could not do it from my one or two attempts

14:47   5    at looking at the invoicing.

14:47   6            MR. LEVY:  Mr. Biderman, I have

14:47   7        a question.

14:47   8            MR. BIDERMAN:  Yeah?

14:47   9            MR. LEVY:  Have you produced to

14:47   10       us all the overdeliverry credits that

14:47   11       Google claims they gave to this

14:47   12       plaintiff?

14:47   13           MR. BIDERMAN:  We produced all

14:47   14       the records we have relating to the

14:47   15       account.

14:47   16           MR. LEVY:  Relating to that?

14:47   17       Including overdelivery credits?

14:47   18           MR. BIDERMAN:  I'll confirm that

14:47   19       we've produced everything that we have

14:47   20       relating to the account.

14:47   21           MR. LEVY:  Okay.

14:48   22       Q.    And other than the one or two

14:48   23   times that you've looked at the invoices, any

14:48   24   other times that you've looked at the

14:48   25   invoices to look for overdelivery credits?

173

BARKLEY
Court Reporters

B. Hanson

| | | |
|---|---|---|
| 14:49 | 2 | A.     Not that I can recall. |
| 14:49 | 3 | Q.     And if you look to -- under |
| 14:49 | 4 | page 96 -- pardon me, tab 96.  If you turn to |
| 14:49 | 5 | page 5 of 41.  There's an e-mail from you |
| 14:49 | 6 | dated Thursday, 13 January 2005.  "Hi, |
| 14:49 | 7 | Bethanie.  Can you please check our |
| 14:49 | 8 | overcharges for our daily budgets by ads and |
| 14:49 | 9 | account CLRB Hanson Industry LLC, customer |
| 14:50 | 10 | ID:  934-396-2830." |
| 14:50 | 11 |            Do you see that reference? |
| 14:50 | 12 | A.     Yes, sir. |
| 14:50 | 13 | Q.     And what prompted you to write |
| 14:50 | 14 | that e-mail? |
| 14:50 | 15 | A.     It appears I wrote it because we |
| 14:50 | 16 | were being overcharged based on the daily |
| 14:50 | 17 | budget. |
| 14:50 | 18 | Q.     And how did you conclude that? |
| 14:50 | 19 | A.     From Google's reports. |
| 14:50 | 20 | Q.     Looking at the daily reports |
| 14:50 | 21 | that you've described earlier today? |
| 14:50 | 22 | A.     Yes, sir. |
| 14:50 | 23 | Q.     And after -- and then you'll see |
| 14:50 | 24 | the response, which is -- appears on the next |
| 14:50 | 25 | page, 4 of 41.  Do you see that?  And in the |

174

BARKLEY
Court Reporters

| | | |
|---|---|---|
| | 1 | B. Hanson |
| 14:50 | 2 | lower quarter of the page you were told, |
| 14:50 | 3 | "Please be assured that for clicks accrued |
| 14:50 | 4 | over your daily budget you will see a CN, |
| 14:51 | 5 | 'Overdelivery credit,' on the 'advertising |
| 14:51 | 6 | costs' page for the charges in question." |
| 14:51 | 7 | And then you are given some |
| 14:51 | 8 | instructions about logging into your account |
| 14:51 | 9 | and going to -- and tabbing to certain |
| 14:51 | 10 | information.  Do you see that? |
| 14:51 | 11 | A.    Yes. |
| 14:51 | 12 | Q.    Did you, in fact, do that to see |
| 14:51 | 13 | whether you were provided overdelivery |
| 14:51 | 14 | credits? |
| 14:51 | 15 | A.    I don't recall. |
| 14:52 | 16 | Q.    Then you responded on Friday, 14 |
| 14:52 | 17 | January 2005, do you see at the top of page 4 |
| 14:52 | 18 | of 41? |
| 14:52 | 19 | A.    Yes. |
| 14:52 | 20 | Q.    Do you see that?  And you said |
| 14:52 | 21 | you wanted to be immediately issued a credit; |
| 14:52 | 22 | is that right? |
| 14:52 | 23 | A.    It appears to be, yes. |
| 14:52 | 24 | Q.    And then you said you were going |
| 14:52 | 25 | to contact your attorney if not; correct? |

175

BRETT R. HANSON

BARKLEY
Court Reporters

B. Hanson

|        |    |                                                    |
|--------|----|----------------------------------------------------|
| 14:52  | 1  |                     B. Hanson                      |
| 14:52  | 2  | A.      It appears, yes.                           |
| 14:53  | 3  | Q.      And then --                                |
| 14:53  | 4  |         (Discussion off the record.)               |
| 14:53  | 5  | Q.      And then on Friday,                        |

        1              B. Hanson
14:52   2    A.       It appears, yes.
14:52   3    Q.       And then --
14:53   4            (Discussion off the record.)
14:53   5    Q.       And then on Friday,
14:53   6    January 14th, if you go to page 2 of 41, you
14:54   7    received a response to that e-mail; is that
14:54   8    correct?
14:54   9    A.       On 2 of 41?
14:54   10   Q.       2 of 41, down there at the
14:54   11   bottom it says on Friday, 14 January, 2005,
14:54   12   Bethanie wrote:  "Hello, Brett."  Do you see
14:54   13   that, at the very bottom?
14:54   14   A.       Yes.
14:54   15   Q.       And then she said, "Thank you
14:54   16   for your reply and your time on the phone
14:54   17   this afternoon."
14:54   18           You actually spoke to Bethanie
14:54   19   about that issue?
14:54   20   A.       That was that January call I was
14:54   21   referring to earlier.
14:54   22   Q.       Coming back from Mississippi?
14:54   23   A.       Right.
14:54   24   Q.       In the car?
14:54   25   A.       Right.

176

BRETT R. HANSON

BARKLEY
Court Reporters

1    B. Hanson

14:54    2    Q.    And then she described in that

14:54    3    phone call that Google would charge up to

14:55    4    120 percent of your daily budget on a given

14:55    5    day but never charge more than the amount of

14:55    6    your daily budget times the number of days in

14:55    7    a month?

14:55    8    A.    I don't believe that that's what

14:55    9    it says in that e-mail.

14:55    10    Q.    Did she explain that to you on

14:55    11    the phone?

14:55    12    A.    I don't -- I don't recall.

14:55    13    Q.    Do you --

14:55    14    MR. BIDERMAN:  Withdraw that

14:55    15    question.

14:55    16    Q.    Do you recall --

14:55    17    MR. BIDERMAN:  Withdraw that

14:55    18    question.

14:55    19    Q.    At some point in time someone

14:55    20    from Google told you, did they not, that you

14:55    21    would be charged up to 120 percent of your

14:55    22    daily budget for a given day but that your

14:55    23    total charges for a month would not exceed

14:55    24    your daily budget times the number of days in

14:55    25    that month?

177

BARKLEY
Court Reporters

1                      B. Hanson

14:55    2        A.      They may have mentioned -- they

14:56    3    may have told me that, but I didn't agree to

14:56    4    it, nor do I ever remember agreeing to such

14:56    5    terms.

14:56    6        Q.      So, in other words, it was

14:56    7    communicated to you, but you didn't agree to

14:56    8    it; is that what you're saying?

14:56    9        A.      Yes.

14:56   10              MR. BIDERMAN:  Let me just see

14:56   11        if I've got any other e-mails to mark.

14:57   12        Q.      And then going back to tab 96

14:57   13    again.

14:57   14        A.      Okay.

14:57   15        Q.      There's a e-mail to you at the

14:58   16    bottom from AdWords support dated March 4,

14:58   17    '05.  Do you see that?

14:58   18              MR. LEVY:  What page?

14:58   19              MR. BIDERMAN:  I'm sorry.

14:58   20        Page 1 of 41.

14:58   21        A.      Yes.

14:58   22        Q.      Okay.  And then this is an

14:58   23    e-mail from someone named Tina.  Do you

14:58   24    recall that, dealing with Tina P.?

14:58   25        A.      Vaguely.

178

BRETT R. HANSON

BARKLEY
Court Reporters

```
              1                    B. Hanson
14:58         2         Q.      Okay.  And you remember that she
14:58         3    wrote to you and told you she would be your
14:58         4    new client service representative, looking at
14:58         5    page 2 of 41?
14:59         6         A.      I'm looking at 2 of 41.  But
14:59         7    what am I looking for?
14:59         8         Q.      "I would like to clarify that I
14:59         9    have taken over as the direct representative
14:59        10    for your account."  Do you see that?
14:59        11              It's in the middle of the string
14:59        12    of text at the top of the page.
14:59        13         A.      Yes.
14:59        14         Q.      And she gave you her e-mail
14:59        15    address; correct?
14:59        16         A.      Yes.
14:59        17         Q.      And she gave you her phone
14:59        18    number?
14:59        19         A.      It appears to be, yes.
14:59        20         Q.      And she gave you the information
14:59        21    that you enter your 10-digit customer ID when
14:59        22    you call.  When you call, your call will be
14:59        23    routed directly to her; is that correct?
14:59        24         A.      That appears to be, yes.
14:59        25         Q.      And she told you also that if
```

                               179

BRETT R. HANSON

BARKLEY
Court Reporters

B. Hanson

1

15:45    2        the videotape deposition of Mr. Brett

15:45    3        Hanson.  We're off the record.

15:45    4              (Time noted:  3:45 p.m.)

15:45    5

15:45    6    I have read the foregoing deposition transcript

15:45    7    and by signing hereafter, approve same.

15:45    8    Dated _____.

15:45    9

15:45   10        _____
                       (Signature of Deponent)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

203

BARKLEY
Court Reporters

Page 204

                    C E R T I F I C A T E

STATE OF NEW YORK      )

                            :SS

COUNTY OF NEW YORK     )

          I, AMY E. SIKORA, CRR, CSR, RPR, a
Certified Realtime Reporter, Certified
Shorthand Reporter, Registered Professional
Reporter and Notary Public within and for the
State of New York, do hereby certify that the
foregoing deposition of BRETT R. HANSON was
taken before me on the 18th day of August, 2006;
          That the said witness was duly
sworn before the commencement of the testimony;
that the said testimony was taken
stenographically by me and then transcribed.
          I further certify that I am not
related by blood or marriage to any of the
parties to this action nor interested directly
or indirectly in the matter in controversy; nor
am I in the employ of any of the counsel in
this action.
          IN WITNESS WHEREOF, I have hereunto
set my hand this 29th day of August, 2006.

                    _____

                    AMY E. SIKORA, CRR,