# EXHIBIT 3

Dockets.Justia.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

IN RE ACACIA MEDIA
TECHNOLOGIES CORPORATION

No. C-05-01114 JW (HRL)
MDL No. 1665

CERTIFIED COPY

DEPOSITION OF ANDREW B. LIPPMAN

Los Angeles, California

Wednesday, August 31, 2005

Reported by:
BETH HANDWEILER
CSR No. 3492

JOB No. 38059

---

www.sarnoffcourtreporters.com

46 Corporate Park, Suite 100
Irvine, CA 92606

445 South Figueroa St., Suite 2950
Los Angeles, CA 90071

phone  877.955.3855
fax      949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

Exhibit 3  Page 20

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                     SAN JOSE DIVISION

 3

 4

 5   IN RE ACACIA MEDIA
     TECHNOLOGIES CORPORATION
 6                                    No. C-05-01114 JW (HRL)
                                      MDL No. 1665
 7

 8

 9

10

11   _____

12

13

14

15        Deposition of ANDREW B. LIPPMAN, taken on behalf of

16   Plaintiff, at 555 South Flower Street, 50th Floor, Los

17   Angeles, California, beginning at 9:45 a.m. and ending

18   at 1:26 p.m. on Wednesday, August 31, 2005, before BETH

19   HANDWEILER, Certified Shorthand Reporter No. 3492.

20

21

22

23

24

25
```

2

```
 1   APPEARANCES:
 2
 3   For Plaintiff Acacia Media Technologies Corporation:
 4        HENNIGAN, BENNETT & DORMAN LLP
          BY:  RODERICK G. DORMAN
 5             ALAN P. BLOCK
          Attorneys at Law
 6        601 South Figueroa Street, Suite 3300
          Los Angeles, California 90017
 7        (213) 694-1200
 8   For DirecTV Group, Inc.:
 9        JONES, DAY
          BY:  KEVIN G. McBRIDE
10             VICTOR G. SAVIKAS
               CHARLES C. WONG
11        Attorneys at Law
          555 South Flower Street, Fiftieth Floor
12        Los Angeles, California 90071
          (213) 489-3939
13
     For Coxcom, Inc., and Hospitality Network:
14
          ROBINS, KAPLAN, MILLER & CIRESI LLP
15        BY:  EMMETT J. McMAHON
          Attorney at Law
16        2800 LaSalle Plaza, 800 LaSalle Avenue
          Minneapolis, Minnesota 55402-2015
17        (612) 349-8500
18   For Charter Communications, Mid-Continent Media,
     US Cable Holdings, Savage Communications, Loretel
19   Cablevision, Arvig Communication System, Cannon Valley
     Communications, Inc., Sjoberg's Cablevision, Inc., the
20   Armstrong Group, Block Communications, Wide Open West,
     East Cleveland Cable TV and Communications, Massillon
21   Cable TV and NPG Cable:
22        MARSHALL, GERSTEIN & BORUN LLP
          BY:  BRADFORD P. LYERLA
23             GREGORY E. STANTON
          Attorneys at Law
24        233 South Wacker Drive, 6300 Sears Tower
          Chicago, Illinois 60606-6357
25        (312) 474-6300
```

3

```
 1   APPEARANCES (Continued):
 2
 3   For Echostar Satellite LLC; Echostar Technologies
     Corporation; Echostar Communications Corporation:
 4
         MORRISON & FOERSTER LLP
 5       BY:  MATTHEW I. KREEGER
         Attorney at Law
 6       425 Market Street
         San Francisco, California 94105-2482
 7       (415) 268-6467

 8   Also Present:

 9       S. MERRILL WEISS
         JOHN CROOK
10
     Videographer:
11
         BRUNO SERE
12       SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
         46 Corporate Park, Suite 100
13       Irvine, California 92606
         (877) 955-3855
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                          INDEX
 2   WITNESS                                   EXAMINATION
 3   ANDREW B. LIPPMAN
 4
 5
              BY MR. DORMAN                         7
 6
 7
 8
 9
10                         EXHIBITS
11
     PLAINTIFF                                      PAGE
12
13   5    Declaration of Andrew Lippman, dated August    6
          25, 2005
14
     6    Declaration of S. Merrill Weiss in Support    57
15        of Acacia's Opposition to Motion for Summary
          Judgment, dated October 20, 2004
16
17
18
19
20
21
22
23
24
25
```

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | A   No.  We discussed it over the telephone.  That                   |
|        | 2  | was done by telephone directly.                                      |
|        | 3  | Q   You dictated your transceiver report over the                    |
|        | 4  | telephone to Jones, Day word processors.  Is that                    |
| 09:55  | 5  | correct?                                                             |
|        | 6  | A   Well, I wouldn't use the word dictate, because                   |
|        | 7  | I said the words that I wanted used.                                 |
|        | 8  | Q   But you didn't dictate.  You mean you explained                  |
|        | 9  | the points of your report?                                           |
| 09:55  | 10 | A   I composed the points.  I phrased the points                     |
|        | 11 | and I stated the points.                                             |
|        | 12 | Q   Now, who was this person you were stating the                    |
|        | 13 | points to for the purpose of --                                      |
|        | 14 | A   I believe it was Charles Wong.                                   |
| 09:56  | 15 | Q   And who is Charles Wong?                                         |
|        | 16 | A   The person seated two seats to my right.                         |
|        | 17 | Q   Do you understand Charles Wong to be a word                      |
|        | 18 | processor?                                                           |
|        | 19 | A   Pardon?                                                          |
| 09:56  | 20 | Q   Is he a word processor?                                          |
|        | 21 | A   He's mighty good at it.                                          |
|        | 22 | Q   So he's a typist?                                                |
|        | 23 | A   He's mighty good at it.  He can do it.                           |
|        | 24 | Q   Is he also a lawyer?                                             |
| 09:56  | 25 | A   I believe he is.                                                 |

14

|       |    |                                                                                              |
|-------|----|----------------------------------------------------------------------------------------------|
|       | 1  | Q    I'm just trying to understand what occurred                                             |
|       | 2  | here.                                                                                        |
|       | 3  | A    That's okay.                                                                            |
|       | 4  | Q    He's a lawyer who you explained the points to,                                          |
| 09:56 | 5  | that then typed them down into a report form.  Is that                                       |
|       | 6  | how the process worked?                                                                      |
|       | 7  | A    Substantially, yes.                                                                     |
|       | 8  | Q    So am I correct that at no time did you prepare                                         |
|       | 9  | any written document yourself, either in handwriting or                                      |
| 09:56 | 10 | anything that you or someone at your direction other                                         |
|       | 11 | than Jones, Day created, in the preparation of your                                          |
|       | 12 | transceiver report?                                                                          |
|       | 13 | A    I'm not exactly sure.  Did I ever type my own                                           |
|       | 14 | notes to myself?                                                                             |
| 09:57 | 15 | Q    No.                                                                                     |
|       | 16 | A    Or did I ever send my writing to them                                                   |
|       | 17 | electronically?                                                                              |
|       | 18 | Q    In terms of the initial preparation of your                                             |
|       | 19 | transceiver report, you did not, yourself, physically                                        |
| 09:57 | 20 | pen any language.  Is that correct?                                                          |
|       | 21 | MR. McBRIDE:  Objection.  Vague and ambiguous.                                               |
|       | 22 | BY MR. DORMAN:                                                                               |
|       | 23 | Q    Can you answer the question?  Do you know what                                          |
|       | 24 | it means to write down?  You yourself didn't write down                                      |
| 09:57 | 25 | the language that was communicated to Jones, Day.  You                                       |

15

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | A    No, you didn't misstate what he said, but in                      |
|       | 2  | this case we may be using the word "function" in                       |
|       | 3  | slightly different ways.  Okay?  The word "function"                   |
|       | 4  | here is describing what you want it to do, okay, as                    |
| 11:30 | 5  | opposed to a function which is like a mathematical                     |
|       | 6  | transformation.  Y is a function of X.  So I                           |
|       | 7  | certainly -- fine.  Enough said.                                       |
|       | 8  | Q    Now, do you agree with the following statement?                   |
|       | 9  | That if one of ordinary skill in the art can determine                 |
| 11:30 | 10 | those three elements for a particular encoder, namely                  |
|       | 11 | the input function as you've described it --                           |
|       | 12 | A    Transformation.                                                   |
|       | 13 | Q    -- and output, he or she will know how a given                    |
|       | 14 | encoder is supposed to work.                                           |
| 11:30 | 15 | A    In general, yes, but you might also want to                       |
|       | 16 | know where that output is directed.  If that helps                     |
|       | 17 | describe what the output is more fully.                                |
|       | 18 | Q    Is it your testimony that if you don't know                       |
|       | 19 | where the output is directed, you can't know how a given               |
| 11:31 | 20 | encoder is supposed to work, even though you know those                |
|       | 21 | other three elements?                                                  |
|       | 22 | A    No, that's not what I said either.                                |
|       | 23 | Q    Do you agree that depending upon the type of                      |
|       | 24 | encoding to be done, one of ordinary skill in the art                  |
| 11:31 | 25 | may choose to implement the encoder in hardware or in                  |

70

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Exhibit 3  Page 27

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | software as appropriate to the system he or she is               |
|       | 2  | building?                                                        |
|       | 3  |     A    Say it again.                                           |
|       | 4  |     Q    Do you agree that depending upon the type of            |
| 11:31 | 5  | encoding to be done, one of ordinary skill in the art            |
|       | 6  | may choose to implement the encoder in hardware or in            |
|       | 7  | software as appropriate to the system he or she is               |
|       | 8  | building?                                                        |
|       | 9  |          MR. McBRIDE:  Objection.  Vague and ambiguous.          |
| 11:32 | 10 |          THE WITNESS:  That's a hard sentence to                 |
|       | 11 | disagree with.  It doesn't say much.                             |
|       | 12 | BY MR. DORMAN:                                                   |
|       | 13 |     Q    Do you agree that the person of ordinary skill          |
|       | 14 | in the art we're talking about is capable of building an         |
| 11:32 | 15 | identification encoder if the input, function and output         |
|       | 16 | is disclosed?                                                    |
|       | 17 |          MR. McBRIDE:  Same objection.                           |
|       | 18 |          THE WITNESS:  Do I believe that someone of              |
|       | 19 | ordinary skill in the art could build it --                      |
| 11:32 | 20 | BY MR. DORMAN:                                                   |
|       | 21 |     Q    If the input, function and output --                    |
|       | 22 |     A    If the input, the transformation and the output        |
|       | 23 | were described, I suppose depending on the complexity of         |
|       | 24 | the encoder, they may or may not, but in general often           |
| 11:32 | 25 | one would hope, yes.  But I can give you an example.             |

```
                1         MR. McBRIDE:  It's completely unclear to me.  I
                2    don't know that any term was coined.  Certainly
                3    "identification encoder," as I understand the word
                4    coined, was not coined in the specification.
11:35           5    BY MR. DORMAN:
                6         Q    Let me go to some issues relevant to an
                7    expert's engagement.  Are you an employee of MIT?
                8         A    Yes.
                9         Q    And I take it you receive income from MIT
11:35          10    itself?
               11         A    Some would call it that.
               12         Q    I'm just trying to understand who your -- I
               13    mean the actual check you get is from MIT?
               14         A    Absolutely.
11:35          15         Q    The MIT Communications Futures Program, you're
               16    actively involved in that, correct?
               17         A    I certainly am.
               18         Q    Did you co-found that?
               19         A    Yes.
11:36          20         Q    Are you involved with the process of raising
               21    money for that program?
               22         A    Yes.
               23         Q    And I understand from your declaration that the
               24    budget for that program is funded in part by Cambridge
11:36          25    MIT Institute and also by industrial sponsors.  Is that
```

73

```
 1  correct?
 2      A   That's correct.
 3      Q   And is part of your job to actually go to
 4  potential industrial sponsors and ask for money?
 5      A   I ask them to join the program.  I encourage
 6  them to join the program.
 7      Q   And if they join the program, is there a
 8  certain amount they customarily pay to join?
 9      A   Yes.
10      Q   How much is that per year?
11      A   It depends on the style of membership, but
12  generally either $100,000 per year or $200,000 per year.
13      Q   Who is the person principally responsible for
14  soliciting those funds?  Is that you?
15      A   For soliciting -- you mean for approaching
16  companies and asking them to join the program?
17      Q   Yes.
18      A   We prefer to use the phrase "join the program"
19  as opposed to saying "solicit funds."
20      Q   All right.
21      A   There are four people who are what you would
22  call the principals who would be principally charged
23  with that, and I am certainly one of them.
24      Q   Now, are you familiar with the yearly budget of
25  the program?
```

Timestamps: 11:36 (line 5), 11:36 (line 10), 11:37 (line 15), 11:37 (line 20), 11:37 (line 25)

74

|       |    |                                                                                     |
|-------|----|-------------------------------------------------------------------------------------|
|       | 1  | A    Yes.                                                                           |
|       | 2  | Q    What is the yearly budget of the program?                                      |
|       | 3  | A    When I say that I don't budget it by year,                                     |
|       | 4  | because there is -- it's not like a contract that has to                            |
| 11:37 | 5  | wind down and spend exactly so much money per year.  In                             |
|       | 6  | other words, the amount of money that the program has                               |
|       | 7  | for its research can be extended.                                                   |
|       | 8  | Q    It's not exactly yearly --                                                     |
|       | 9  | A    My point is to make the budget income exceed                                   |
| 11:38 | 10 | the outflow.  The burn rate has to be less than what we                             |
|       | 11 | expect to have for the length that we want to run it.                               |
|       | 12 | On the order of $2 million a year.  A little                                        |
|       | 13 | less.  Sometimes that number is a mix of what we hope to                            |
|       | 14 | sign as sponsors --                                                                 |
| 11:38 | 15 | Q    Of that approximate $2 million a year, what                                    |
|       | 16 | percentage of that comes from the Cambridge MIT                                     |
|       | 17 | Institute and what percentage from sponsors, roughly?                               |
|       | 18 | A    Well, it's about $700,000, $800,000 from the                                   |
|       | 19 | industrial sponsors for this year.  On the order of                                 |
| 11:38 | 20 | that, plus a little from CMI, Cambridge MIT Institute.                              |
|       | 21 | Q    Are there any sponsorships less than $100,000                                  |
|       | 22 | per year?  Is that the minimum?                                                     |
|       | 23 | A    If you join the program you either join it as                                  |
|       | 24 | an affiliate for $100,000, or you are joining it as a                               |
| 11:39 | 25 | full sponsor for $200,000.  If you are a sponsor of the                             |

75

|        |    |                                                                            |
|--------|----|----------------------------------------------------------------------------|
|        | 1  | MIT media laboratory, then you are adding it to                            |
|        | 2  | essentially your support of our programs, so that                          |
|        | 3  | increment would be $100,000. I could allow a company in                    |
|        | 4  | for nothing if I wanted, if I wanted their presence.                       |
| 11:39  | 5  | But there are currently no supporting industrial                           |
|        | 6  | sponsors of the program who have signed a contract for                     |
|        | 7  | less than $100,000.                                                        |
|        | 8  |     Q    Can you tell me who the current industrial                        |
|        | 9  | sponsors are?                                                              |
| 11:39  | 10 |     A    Well, there is Samsung, Motorola, Comcast. I                      |
|        | 11 | apologize but I'm not good at enumerating the entire                       |
|        | 12 | list.                                                                      |
|        | 13 |     Q    Would you take a minute and look at the list of                   |
|        | 14 | defendants in this case and tell me if any of these                        |
| 11:40  | 15 | defendants are --                                                          |
|        | 16 |     A    Sponsors of CFP?                                                  |
|        | 17 |     Q    Yes.                                                              |
|        | 18 |     A    Sure. Somebody else will have to correct me if                    |
|        | 19 | I'm wrong as to whether they're parties in this case.                      |
| 11:40  | 20 | Comcast is a sponsor of the Communications Futures                         |
|        | 21 | Program. I already mentioned them. At MIT for a                            |
|        | 22 | sponsored research program it's -- I'd like to grow the                    |
|        | 23 | program. Maybe I can put it in a simple way. I'd like                      |
|        | 24 | to grow the program, and can I keep this list and ask                      |
| 11:41  | 25 | them -- the ones who aren't are ones that we would                         |

|        |    |                                                                          |
|--------|----|--------------------------------------------------------------------------|
|        | 1  | that the term "unique identification code" in the '702                   |
|        | 2  | patent is ambiguous because it is functionally                           |
|        | 3  | indistinguishable from the "unique address code?"                        |
|        | 4  | A    Have I changed my opinion from what I've                            |
| 12:09  | 5  | written in that sentence?                                                |
|        | 6  | Q    Yes.                                                                |
|        | 7  | A    I have not.                                                         |
|        | 8  | Q    Did you hear what Peter Alexander said on that                      |
|        | 9  | issue yesterday?                                                         |
| 12:09  | 10 | A    I was there.                                                        |
|        | 11 | Q    You don't recall what he said?                                      |
|        | 12 | A    I don't think that I would want to be quizzed                       |
|        | 13 | on it.  I haven't read it or thought about it since.                     |
|        | 14 | Q    Turn to your paragraph 62.  We're moving into                       |
| 12:10  | 15 | sequence encoder.  You say that claim 7 recites that the                 |
|        | 16 | "sequence encoder transforms digital data blocks into a                  |
|        | 17 | group of addressable data blocks."  Do you see that?                     |
|        | 18 | A    Yes.                                                                |
|        | 19 | Q    Is the time encoder disclosed in the patent                         |
| 12:10  | 20 | capable of this function?                                                |
|        | 21 | MR. McBRIDE:  Objection.  Vague and ambiguous.                           |
|        | 22 | BY MR. DORMAN:                                                           |
|        | 23 | Q    To one of ordinary skill in the art reading the                     |
|        | 24 | specification of the '702 patent, is the time encoder                    |
| 12:11  | 25 | disclosed to be capable of performing this function?                     |

87

```
              1        A    I think that quote there in claim 7 mirrors
              2   text in the patent.
              3        Q    That's the text from claim 7?
              4        A    Yes.
     12:11    5        Q    But my question used the word time encoder, not
              6   sequence encoder.
              7        A    I would have to look at the spec for the
              8   patent.
              9        Q    Let me help you.  Go to column 7, line 57.
     12:12   10        A    Um-hum.
             11        Q    And read that to yourself, and then if the
             12   court reporter will reread my question.
             13             (Record read as follows:
             14             "Question:  To one of ordinary skill
     12:11   15             in the art reading the specification
             16             of the '702 patent, is the time
             17             encoder disclosed to be capable of
             18             performing this function?")
             19             THE WITNESS:  The time encoder described in
     12:12   20   that sentence performs the same function.  It's claimed
             21   to perform the same function.  Uses the same words.
             22   BY MR. DORMAN:
             23        Q    Do you recall Mr. Alexander's testimony
             24   yesterday where he talked about a data block being
     12:13   25   synonymous with a frame, or words to that effect?
```

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | BY MR. DORMAN:                                                 |
|       | 2  | Q   You don't see where it says it's done by the               |
|       | 3  | time encoder?                                                   |
|       | 4  | A   Actually it doesn't even really say that, does             |
| 12:23 | 5  | it?                                                            |
|       | 6  | Q   It says, "The sequence of addressable data                 |
|       | 7  | blocks which was time encoded and output by time               |
|       | 8  | encoder."                                                      |
|       | 9  | A   Right.  But that doesn't imply that the                    |
| 12:24 | 10 | sequence -- the sequence of addressable data blocks            |
|       | 11 | could have arrived at the time encoder in sequence, in         |
|       | 12 | which case the time encoder would have done nothing to         |
|       | 13 | them and passed them on.                                       |
|       | 14 | Q   On paragraph 67 of your declaration you say,               |
| 12:25 | 15 | "The term 'sequence encoder' does not appear in the            |
|       | 16 | specification of the '702 patent.  Because the term            |
|       | 17 | 'sequence encoder' has no ordinary meaning, and the term       |
|       | 18 | is not defined in the specification, a person of               |
|       | 19 | ordinary skill in the art cannot understand what is            |
| 12:25 | 20 | meant by a sequence encoder."                                  |
|       | 21 | Would you agree with the statement that is                     |
|       | 22 | identical to your paragraph 67, but which included the         |
|       | 23 | words "at all" after the word "understand"?                    |
|       | 24 | MR. McBRIDE:  Objection.  Vague and ambiguous.                 |
| 12:25 | 25 | THE WITNESS:  "A person of ordinary skill                      |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Exhibit 3 Page 35

|       |    |                                                                                |
|-------|----|--------------------------------------------------------------------------------|
|       | 1  | cannot understand at all what is meant by a sequence                           |
|       | 2  | encoder"?                                                                      |
|       | 3  | BY MR. DORMAN:                                                                 |
|       | 4  | Q    Yes. Would you agree with that statement?                                 |
| 12:26 | 5  | MR. McBRIDE:  Same objection.                                                  |
|       | 6  | THE WITNESS:  That's a good question. I would                                  |
|       | 7  | have to think about that. This is similar to the kind                          |
|       | 8  | of question you asked me before, where it said would it                        |
|       | 9  | provide no insight. I'm not sure. I would have to                              |
| 12:26 | 10 | think about it.                                                                |
|       | 11 | Can you rephrase it and put it in a way that --                                |
|       | 12 | BY MR. DORMAN:                                                                 |
|       | 13 | Q    No, that's the question. This gets back to                                |
|       | 14 | why -- you're not able to answer that question?                                |
| 12:27 | 15 | A    It's a lovely question. I would love to think                             |
|       | 16 | about it.                                                                      |
|       | 17 | Q    This is the topic of your expert testimony,                               |
|       | 18 | so --                                                                          |
|       | 19 | A    The topic isn't the word "at all." I mean if I                            |
| 12:27 | 20 | felt strongly and had thought about it, I would have                           |
|       | 21 | been happy to include the word "at all" if it applied.                         |
|       | 22 | So I think it's fair to say that I ought to be able to                         |
|       | 23 | reflect on it. I guess I can't agree with that, because                        |
|       | 24 | in claim 7 there is a statement made as to what the                            |
| 12:27 | 25 | sequence encoder does that casts more light than zero on                       |