1  `

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                              SAN JOSE DIVISION

10    CLRB Hanson Industries, LLC, et al.,            NO. C 05-03649 JW

11                    Plaintiffs,              **ORDER DENYING PLAINTIFFS'
                                               MOTION FOR PARTIAL SUMMARY
        v.                                     JUDGMENT; GRANTING IN PART**
12                                             **AND DENYING IN PART**
      Google Inc.,                             **DEFENDANT'S MOTION FOR**
13                                             **SUMMARY JUDGMENT**
                      Defendant.
14    _____/

15                         **I.  INTRODUCTION**

16          CLRB Hanson Industries LLC ("CLRB Hanson") and Howard Stern ("Stern") (collectively,

17   "Plaintiffs") bring this putative class action against Defendant Google, Inc. ("Google"), alleging,

18   *inter alia*, breach of contract and violation of California's Unfair Competition Law, Cal. Bus. &

19   Prof. Code § 17200 et seq.  Presently before the Court are (1) Plaintiffs' Motion for Partial Summary

20   Judgment and (2) Defendant's Motion for Summary Judgment.  The Court conducted hearings on

21   January 22, 2007 and June 11, 2007.  Based on the papers submitted to date and the oral arguments

22   of counsel, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment and GRANTS in

23   part and DENIES in part Defendant's Motion for Summary Judgment.

24                          **II.  BACKGROUND**

25   **A.      Undisputed Facts**

26          CLRB Hanson is a Minnesota limited liability corporation.  (Second Amended Class Action

27   Complaint ¶ 8, hereafter, "SAC," Docket Item No. 47.)  Stern is a New Jersey citizen.  (SAC ¶ 9.)

28   Google is a Delaware corporation with its principal place of business in California.  (SAC ¶ 10;

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

Defendant Google Inc.'s Answer to Plaintiffs' Second Amended Class Action Complaint ¶ 10, hereafter, "Answer," Docket Item No. 62.)

Google provides a widely used Internet search engine service located at http://www.google.com. (SAC ¶ 11; Answer ¶ 11.)  Users type words ("search terms") into a search box on Google's search screen; the search engine returns a search results page with links to websites that contain the search terms.  The search results page also contains a "Sponsored Links" section, which contains links to the websites of businesses who provide the services, or sell the products, described by the inputted search terms.[1]  "Sponsored Links" are advertisements of the advertisers who sign up for, and pay for, Google's global advertising program ("AdWords").  (Id.; see also SAC ¶ 14; Answer ¶ 14; Statement of Undisputed Facts ¶¶ 1-2, hereafter, "SUF," submitted under seal.)

Advertisers enroll in AdWords by signing up online.  (SUF ¶ 4; SAC ¶ 19; Answer ¶ 19.)  During the registration process, an advertiser (1) creates its ad text (the text of the advertisement that will appear with the search result); (2) selects keywords that will trigger the display of the ad;[2] (3) selects geographic locations to target; (4) sets a maximum cost-per-click to spend when someone clicks on the ad; and (5) sets a daily budget.  (SUF ¶¶ 6, 9; SAC ¶¶ 22, 30; Answer ¶¶ 22, 30.)  To create the AdWords account itself, an advertiser must provide an email address, choose a password, and select a method of billing.  (SUF ¶ 8; SAC ¶¶ 22-25; Answer ¶¶ 22-25.)

During the sign-up process, advertisers can click on form questions or search for help by entering terms for which they have questions.  (SUF ¶ 7; SAC ¶ 26; Answer ¶ 26.)  In each case, Google responds with relevant portions of the Frequently Asked Questions.  Id.  AdWords states that it gives advertisers the right to set their own daily budget as a method of cost control.  (SUF ¶ 13; SAC ¶ 32; Answer ¶ 32.)  On an AdWords webpage titled "AdWords Advantages," Google represents to advertisers that they can "[f]ully control [their] ad budget."  (SUF ¶ 13; SAC ¶ 16;

---

[1]  "Sponsored Links" advertisements also appear "in similar locations on the search and content sites and products in the Google network."  (SAC ¶ 11; Answer ¶ 11.)

[2]  The "keywords" trigger the ad to run when an Internet user inserts a search into the Google search engine which includes those keywords.  (SAC ¶ 22; Answer ¶ 22.)

Answer ¶ 16.)  Google represents that if an AdWords advertiser accrues clicks that would result in charges of more than 20 percent above daily budget in a single day, the AdWords system is designed to provide an overdelivery credit.  (SUF ¶ 15.)  Google further represents that if an ad campaign accrues clicks that would result in charges exceeding more than the number of days in the month multiplied by the advertiser's daily budget, the AdWords system will provide the advertiser with an overdelivery credit for the charges at the end of the month.  (SUF ¶ 16.)  During the course of an AdWords campaign, an advertiser may "pause" the campaign.  (SUF ¶ 11.)   In September 2006, Google introduced "Ad Scheduling."  (SUF ¶ 17.)

**B.     The AdWords System**

At the January 22, 2007 hearing, it became apparent that the parties lacked sufficient information as to how the AdWords system operated.  The Court issued an Order directing the parties to conduct further discovery: "Presently, there is insufficient evidence describing how the AdWords system accounts for fluctuations in Internet traffic and offsets prior shortfalls in advertising hits.  For instance, there is insufficient evidence in the record establishing that overdelivery by 120 percent will actually occur on the first day that an advertising campaign is commenced."  (See Order Following Hearing on Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment, or in the Alternative, for Summary Adjudication, Docket Item No. 111.)  The parties have now presented the following additional evidence regarding the AdWords system to the Court:

**1.     Daily Budget and Overdelivery**

An advertiser creating an AdWords account must specify a "Daily Budget," which Google defines in its FAQs as follows:[3]

The amount you're willing to spend on a specific AdWords campaign each day.

AdWords displays your ad as often as possible while staying within your daily budget.  When the budget limit is reached, your ads will typically stop showing for

---

[3] This definition of "Daily Budget" was taken from Google's FAQs printed August 14, 2006.  Id.

1    that day.  How quickly your ads are shown during a given day is determined bv your
2    ad delivery setting.

     On any single day, the AdWords system may deliver up to 20% more ads than your
3    daily budget calls for.  This helps make up for other days in which your daily budget
     is not reached.  However, you'll never be charged more than your average daily
4    budget over the course of a month.  For example: if your daily budget is $10 and the
     month has 30 days, you might be charged up to $12 on any single day but your
5    monthly charges will never exceed $300.

6    (Declaration of M. Christopher Jhang, Ex. D, hereafter, "Jhang Decl.," Docket Item No. 90.)

7    Google's customer service witness, Heather Wilburn, explained the reasoning underlying the "Daily

8    Budget" in her deposition:

9        Whatever the number of days are in that month, multiplied by whatever the daily
         budget was during that time frame, is the amount that we're assuming the advertiser
10       wanted to spend during that time frame.  So if it's a $10 daily budget in a 30-day
         month, that advertiser is telling us they want to spend $300 in that month.  If they ran
11       out of product and they had to pause their ads, if their web server went down and they
         had to pause their ad, if they went on vacation for the weekend and they are a small
12       mom and pop and they can't deliver their product while they are on vacation, they
         pause during those days.  But what that daily budget is telling us is they want to
13       spend up to $10 in a day, and if we see we were unable to do that during that time
         frame, that's a shortfall.  So those are days of unused daily budget.  We couldn't
14       deliver their ad as they requested us to do.  We'll push up to 20 percent forward to
         make up for that time frame when the ad wasn't being shown, because we assume
15       they want it to be shown during that time frame.  They want to spend $300 that
         month.  That's what they indicate to us by the daily budget.
16

17   (Supplemental Declaration of M. Christopher Jhang in Support of Google Inc.'s Supplemental Brief

18   in Support of Summary Judgment Motion, Ex. A, (Wilburn Dep.) at 67:22-68:20, hereafter,

     "Wilburn Dep.," submitted under seal).
19

20        Google's internal documents confirm that overdelivery is built into the system.  For instance,

21   one training slide states: "Delivery is built into system to account for variations in traffic from day to

22   day – this causes overdelivery.  Overdeliver on weekdays to make up for underdelivery on

23   weekends."  (Supplemental Declaration of Michele F. Raphael in Support of Plaintiffs' Motion for

24   Partial Summary Judgment, Ex. G, hereafter, "Raphael Supp. Decl.," submitted under seal.)

25

26

27

28                                          4

United States District Court

For the Northern District of California

### 2.     Billing

Google bills advertisers according to one of three methods: prepaid, threshold credit, or credit terms.  First, an advertiser may prepay, in which case Google will stop running the ad when the prepaid amount is reached.  (Supp. Jhang Decl., Ex. B (Deposition of Michael Schulman, hereafter, "Schulman Dep.") at 24:2-6.)  Second, an advertiser may use Google's "threshold credit" system, which requires the advertiser to provide a credit card.  Google will bill an advertiser every thirty days, or every time they hit their credit limit, whichever comes first.  An advertiser begins with an initial credit limit of $50, which is gradually raised to $200, then $350, then finally to $500.  (Supp. Jhang Decl., Ex. C (Google Internal Training Document)).  Lastly, an advertiser may use "credit terms," which is a straightforward monthly billing cycle.  (Schulman Dep. at 24:11-14.)

### 3.     Structure of the AdWords System: Serving and Monetizer Sides

The AdWords system has two components.  The "serving" side determines when to deliver an advertiser's ad.  The "monetizer" side calculates the number of clicks an ad has received, and of those clicks, for which the advertiser owes Google (versus for which Google owes the advertiser overdelivery credits).  (Schulman Dep. at 19:20-20:3.)

#### i.     Serving

Google's system attempts not to deliver more ads than an advertiser's daily budget allows.  Michael Schulman explained this concept in qualified terms:[4]

> In general, the <u>system will attempt not to</u> [deliver more ads than the daily budget], specifically on any day where the average before it has reached the daily budget.  The system is designed not to deliver in that case.  So it <u>will try not to</u> overdeliver on the first day.  And if it reaches the daily budget on the daily budget (sic), it <u>will try not to</u> overdeliver on the second day.

(Schulman Dep. at 54:24-55:15.)  Google senior staff engineer Shivakumar Venkataraman corroborated this qualified explanation:

---

[4]  Schulman indicated that his knowledge of the system was based on conversations about system design with the designers of the system, and that he was not aware of objective evidence beyond source code that could corroborate his description.  (Schulman Dep. at 55:16-24.)

1

2

> Q: If an ad has a daily budget of $10, is it possible that the ad will be delivered above $10 on the first day the ad runs?

3

> A: It is programmed to go up to 100 percent, but there may be situations, due to bugs or other means, that it may go above $10.

4    (Supp. Jhang Decl. Ex. D (Deposition of Shivakumar Venkataraman, hereafter, "Venkataraman

5    Dep.") at 26:18-23.)  Schulman explained that time delays between when users click on ads and

6    when the serving system processes information could lead to overdelivery:

7

8

9

10

11

12

13

> From my understanding, the serving system is a vast system that serves ads across the world.  And at some points, you know, when the budget is reached, there might have been clicks that had occurred.  So imagine, an example, that you have clicks going on in China and Korea and North America and things like that.  It takes time for those clicks – from when they happen, for the information about those clicks to reach the central system that decides the budgeting, and from the time that budgeting system recognizes the person has reached their budget for that information to reach back out to all the serving systems to tell them to stop serving that ad.  So there is a time delay in there.  And we do our best and – you know, to minimize that time delay and also minimize overdelivery.  And – but there are certain circumstances where they will overdeliver due to that time delay.  And also, it's possible due to bugs or unforeseen circumstances.

14    (Schulman Dep. at 59:10-60:3.)  Schulman stated, by implication, that it was possible for someone

15    to incur more clicks than their Daily Budget would allow for on the first day of the month (for

16    instance, because of server delays).  In that situation, the advertiser would not immediately be

17    charged for that amount:

18

19

> [L]et's say that on the first day, by chance they served $104.50 [with a Daily Budget of $100] because of this time delay or some other issue.  We won't charge them for that $4.50.  What we will do is keep it in what I like to call limbo.  And in that – if, say, on the next day, they only served $90 due to traffic patterns or other things like that, then that $4.50 is then used to fill in the gap.

20

21    (Schulman Dep. at 62:3-11.)  Venkataraman, too, stated that there could be situations, "due to bugs

22    or other means," that the system could exceed the Daily Budget on the first day.  (Venkataraman

23    Dep. at 26:18-23.)

24        The serving system is designed to review an ad's history-to-date for a given month to

25    determine whether the average falls short of the advertiser's Daily Budget.  If so, the system

26    attempts to redress the shortfall, but never exceeding 120 percent of the Daily Budget: "[T]he

27    serving system itself does not aim to charge more than 20 percent on any given day.  It only does

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    that – the serving system only does that if the customer is currently under-budget across the – across

2    the days before."  (Schulman Dep. at 57:16-20; Venkataraman Dep. at 39:11-43:1.)

3    **ii.    Monetizer**

4    The monetizer computes (1) the number of ads served for a given advertiser (the cost) and

5    (2) what the advertiser owes Google (the charge).  The charge cannot exceed the advertiser's Daily

6    Budget times the number of days in the month.  (Wilburn Dep. at 40:5-12.)  If the cost exceeds the

7    charge, the advertiser receives the difference as an overdelivery credit (i.e. is not billed by Google

8    for the excess amount.)  Id.  Overdelivery cannot be carried from one month to the next; the

9    advertiser receives overdelivery credits at the end of the month.  (Schulman Dep. at 62:19-21.)

10    **4.    Pausing**

11    Google allows advertisers to "pause" an ad campaign, meaning that the serving system does

12    not display the ad during the paused period.  The effect of "pausing" for a full day on the

13    advertiser's charge has varied with time.  Google describes "pausing" in its AdWords Help Center

14    as follows:

15    Q: Can I have my ads run at particular times of day?

16    A: Yes, you can.  The ad scheduling feature of AdWords lets you schedule your ads
      for particular hours of the day, or specific days of the week . . . You can also pause
17    your campaigns completely at any time.  You won't accrue charges while your ads
      are paused, and they'll remain paused until you resume them.

18

19    (Declaration of Michele F. Raphael in Support of Plaintiffs' Motion for Partial Summary Judgment,

20    Ex. B, hereafter, "Raphael Decl.," Docket Item No. 81.[5])

21    **i.    Pre-September 2006**

22    Prior to September 2006, "pausing" was a serving side feature only; that is, the monetizer

23    could not detect whether an ad was paused.  A fully paused day (a 24-hour period in Pacific

24    Standard Time) was treated as an under-delivered day by the system.  (Schulman Dep. at 32:25-

25    33:6.)  Thus, if the first day of the month was a fully-paused day, the AdWords serving system

26    ────────────────

27    [5] This version of the FAQs was accurate as of September 29, 2006.

28    7

1    would attempt to deliver up to 120 percent of the daily budget on the second day in order to

2    compensate for the perceived shortfall.  (Schulman Dep. at 33:22-37:7; 39:5-23; 68:15-69:11;

3    Venkataraman Dep. at 49:5-18; 54:6-55:2.)

ii.    **Post-September 2006**

5        In September 2006, Google introduced a new feature called "Ad Scheduling."  (Schulman

6    Dep. at 20:8-21:20.)  In its AdWords Help Center, Google describes "Ad Scheduling" as follows:

7        Ad scheduling lets you control the days and times your AdWords campaigns appear.

8        Your AdWords ads normally are available to run 24 hours each day.  Ad scheduling
        allows you to set your campaigns to appear only during certain hours or days of each
9        week.  For example, you might set your ads to run only on Tuesdays, or from 3:00
        until 6:00 pm daily.  With ad scheduling, a campaign can run all day, every day, or as
10       little as 15 minutes per week . . .

11       Ad scheduling will not raise or lower your budget.  The AdWords system will try to
        reach your usual daily budget in whatever number of hours your ad runs each day.

12
13   (Raphael Decl., Ex. J at 264.)  The Ad Scheduling feature allowed the monetizer to recognize fully

14   paused days (a 24-hour period in the advertiser's time zone) and to stop treating them as under-

15   delivered days.  (Schulman Dep. at 32:9-33:21; Venkataraman Dep. at 49:5-18; 54:6-55:2.)

16   **C.    Plaintiffs' AdWords Accounts**

17       **1.    Registration for AdWords**

18       Brett Hanson, on behalf of CLRB Hanson, and Stern have declared:

19       When [CLRB (and its predecessor, Industrial Printing) and Stern] enrolled in the
        AdWords campaign, it provided the information required, such as, the name of the ad
20       campaign, email address, billing information, daily budget and costs per click.  I was
        not directed to, nor did I, review any of the numerous FAQs (frequently asked
21       questions) that you can access online if you wanted to.  I do not recall that I had to
        accept the FAQs prior to joining the AdWords program . . .

22   (CLRB Hanson Decl. ¶ 4; Stern Decl. ¶ 4.)  Google has submitted evidence that each advertiser must

23   agree to the AdWords Agreement in order to create an AdWords account; that the AdWords

24   Agreement is accessible to the advertiser during the sign-up process; and that the requirement was in

25

26

27

28                                                          8

*United States District Court*
For the Northern District of California

place both in July 2002 and in October 2003, when Plaintiffs became AdWords advertisers.[6]  At

relevant times, the AdWords Agreement (hereafter, "Agreement") incorporated (1) the AdWords

Select Standard Terms and Conditions; (2) the AdWords Select Program; (3) Frequently Asked

Questions, subject to periodic revisions; and (4) the terms of any advertising campaign submitted or

modified by the advertiser.  Id.  Whenever Google updates the terms of the Agreement, all

advertisers must accept the new terms to continue advertising with AdWords, within in a limited

amount of time (ordinarily thirty days).  (Wilburn Decl. ¶ 5; Schulman Decl. ¶ 11.)

### 2.    Charges to Plaintiffs' AdWords Account

Stern has submitted declaration evidence indicating: (1) in September 2005, he ran an

AdWords campaign for four days with a Daily Budget of $10, but was charged $43.25; and (2) in

December 2005, he ran an AdWords campaign for two days with a Daily Budget of $10, but was

charged $21.28.  (Declaration of Howard Stern in Support of Plaintiffs' Motion for Partial Summary

Judgment ¶ 6, Ex. B, hereafter, "Stern Decl.," Docket Item No. 83.)  CLRB Hanson has submitted

declaration evidence indicating: (1) in February 2005, it ran an AdWords campaign for twenty-seven

days with a Daily Budget of $50, but was charged $1,399.99 (or $49.99 more than Daily Budget *

number of days that campaign was active); and (2) in March 2005, it ran an AdWords campaign for

seventeen days with a Daily Budget of $50, but was charged $1,063.35 (or $213.35 more than Daily

Budget * number of days that campaign was active).  It received $177.85 in overdelivery credits for

the March campaign.  (Declaration of CLRB Hanson Industries, LLC in Support of Plaintiffs'

Motion for Partial Summary Judgment ¶ 6, Ex. B, hereafter, "Hanson Decl.," Docket Item No. 84.[7])

Google apparently does not contest this evidence, instead contending: "Each example of

advertising charges in the Stern and Hanson declarations is entirely consistent with Google's rights

---

[6]  (Declaration of Heather Wilburn ¶¶ 3-4, hereafter, "Wilburn Decl.," Docket Item No. 99; Declaration of Michael Schulman ¶ 10, hereafter, "Schulman Decl.," Docket Item No. 88; Wilburn Dep. at 71:23-72:22; 74:9-18, Dep. Ex. 5, Bates No. GOOG-HN 022047.)

[7]  Although the declaration is styled as that of CLRB Hanson, it is actually the declaration of CLRB Hanson's shareholder and principal, Brett R. Hanson.

9

1   under the Agreement.  In no instance have Plaintiffs demonstrated that they were charged more than

2   20 percent of their daily budget in a single day or more than their average daily budget over the

3   course of a month."  (Opposition to Plaintiffs' Motion for Partial Summary Judgment, hereafter,

4   "Google's Opposition," Docket Item No. 91.)

5   **D.**   **Procedural History**

6       On August 3, 2005, Plaintiffs filed this action in Santa Clara County Superior Court.  (Notice

7   of Removal, Docket Item No. 1, Ex. A-1.)  On September 12, 2005, Google removed this action to

8   federal court on the basis of diversity jurisdiction.  Id.  The operative complaint is Plaintiffs' Second

9   Amended Class Action Complaint, filed on May 4, 2006.  (See Docket Item No. 47.)  Plaintiffs

10  allege five causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith

11  and fair dealing; (3) violation of Cal. Bus. & Prof. Code § 17200 et seq.; (4) violation of Cal. Bus. &

12  Prof. Code § 17500 et seq.; and (5) unjust enrichment.

13      Presently before the Court are (1) Plaintiffs' Motion for Partial Summary Judgment and (2)

14  Defendant's Motion for Summary Judgment, or in the Alternative, Summary Adjudication.

15                                   **III.  STANDARDS**

16      Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

17  admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

18  material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.

19  56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims

20  or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).  The moving party "always bears the

21  initial responsibility of informing the district court of the basis for its motion, and identifying the

22  evidence which it believes demonstrates the absence of a genuine issue of material fact."  Id. at 323.

23  The non-moving party must then identify specific facts "that might affect the outcome of the suit

24  under the governing law," thus establishing that there is a genuine issue for trial.  Fed. R. Civ. P.

25  56(e).

26

27

28                                              10

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    When evaluating a motion for summary judgment, the court views the evidence through the

2    prism of the evidentiary standard of proof that would pertain at trial.  Anderson v. Liberty Lobby

3    Inc., 477 U.S. 242, 255 (1986).  The court draws all reasonable inferences in favor of the non-

4    moving party, including questions of credibility and of the weight that particular evidence is

5    accorded.  See, e.g. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court

6    determines whether the non-moving party's "specific facts," coupled with disputed background or

7    contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

8    T.W. Elec. Serv., 809 F.2d at 631.  In such a case, summary judgment is inappropriate.  Anderson,

9    477 U.S. at 248.  However, where a rational trier of fact could not find for the non-moving party

10    based on the record as a whole, there is no "genuine issue for trial."  Matsushita Elec. Indus. Co. v.

11    Zenith Radio, 475 U.S. 574, 587 (1986).

12                                        **IV.  DISCUSSION**

13    Plaintiffs move for partial summary judgment as to liability on their Third, Fourth, and Fifth

14    Causes of Action, for violations of Cal. Bus. & Prof. Code §§ 17200, 17500 et seq. and for unjust

15    enrichment.  Google moves for summary judgment on each of Plaintiffs' five causes of action.

16    **A.    Breach of Contract**

17    Google moves for summary judgment on the grounds that (1) the parties had an enforceable

18    contract, the AdWords Agreement ("Agreement") and Google acted in accordance with its

19    contractual rights under the Agreement and (2) Plaintiffs have not established damages.

20    (Memorandum of Points and Authorities in Support of Google Inc.'s Motion for Summary

21    Judgment, or in the Alternative, for Summary Adjudication at 12-18, hereafter, "Google's Motion,"

22    Docket Item No. 89.)

23    Plaintiffs have alleged the existence of a contract that includes Google's Standard Terms and

24    Conditions.  (SAC ¶ 77.)  Plaintiffs allege two breaches of contract: (1) that Google's delivery of

25    Plaintiffs' ads exceeded the Daily Budget and (2) that Google charged Plaintiffs for periods during

26    which their ads were paused.  (SAC ¶¶ 76-85.)  The Court considers (1) whether the parties had a

27

28                                              11

United States District Court

For the Northern District of California

valid contract and, if so, its terms and (2) whether Google's undisputed billing practices – overdelivery of up to 120 percent of the Daily Budget and pausing – violated the terms of the contract.

Under California law, to recover for a breach of contract, a plaintiff must establish (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages.  Westways World Travel v. AMR Corp., 182 F. Supp. 2d 952, 963 (C.D. Cal. 2001) (quoting Reichert v. General Ins. Co. of Am., 68 Cal. 2d 822, 830 (1968)).

Plaintiffs appear to contend that a contract did not exist[8] because (1) Plaintiffs do not recall having to click a button to agree to any terms; (2) "given the indisputable maze of hyperlinks, Plaintiffs cannot be deemed to have assented to everything within the hundreds of pages of FAQs"; and (3) even if there was an enforceable contract, the contract "is simply to be a sponsored link in exchange for paying for one's own daily budget."  (Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Google Inc.'s Motion for Summary Judgment, or in the Alternative, for Summary Adjudication at 13-17, hereafter, "Plaintiffs' Opposition," Docket Item No. 95.)

A common law contract requires a manifestation of an agreement between the parties. Windsor Mills, Inc. v. Collins & Aikman Corp., 25 Cal. App. 3d 987, 992 (1972).  Regardless of an apparent outward manifestation of consent, an offeree "is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious."  Id. at 993.  Within the Internet downloading context, courts have applied these principles to hold that "a consumer's clicking on a download button does not communicate assent to

_____

[8]  In their Second Amended Complaint, Plaintiffs assert breach of contract as a cause of action.  However, in their Opposition to Google's Motion for Summary Judgment, Plaintiffs appear to contest whether or not the parties had a valid contract; for instance, Plaintiffs use language such as, ". . . even if Plaintiffs can be found to have entered into an enforceable contract with Google . . ." (Plaintiffs' Opposition at 15.)  Plaintiffs suggest that if there is a contract at all, it is "to be a sponsored link in exchange for paying for one's daily budget."  However, Plaintiffs fail to explain the basis for their belief or provide any evidence establishing that they formed a contract with those limited terms.

contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms." Specht v. Netscape Comm. Corp., 306 F.3d 17, 29-30 (2nd Cir. 2002) (applying California law).

As described in Section II.C(1), *supra*, AdWords advertisers were required to agree to the AdWords Agreement, which incorporated: (1) the AdWords Select Standard Terms and Conditions; (2) the AdWords Select Program; (3) Frequently Asked Questions, subject to periodic revisions; and (4) the terms of any advertising campaign submitted or modified by the advertiser. AdWords advertisers were also required to accept any updated terms within thirty days to continue advertising with AdWords. Although Plaintiffs do not recall reviewing the Frequently Asked Questions prior to signing up, they have not contradicted Google's evidence that they were required to agree to the AdWords Agreement. (Hanson Decl. ¶ 4; Stern Decl. ¶ 4.)

The principal case that Plaintiffs cite for the proposition that they "cannot be deemed to have consented to that which they did not know" is Specht. (Plaintiffs' Opposition at 13.) In Specht, the plaintiffs accepted Netscape's invitation to download two software programs, SmartDownload and Communicator. 306 F.3d at 21. To install Communicator, the plaintiffs were shown a scrollable text of the program's license agreement (which contained a license agreement); the plaintiffs were not permitted to complete the installation until they had clicked on a "Yes" button to indicate that they accepted all the license terms. Id. at 21-22. To install SmartDownload, the plaintiffs clicked on a "Download" button located near the bottom of their screen; the only reference to the license terms "was located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen."[9] Id. at 23. The plaintiffs first downloaded SmartDownload, then used SmartDownload to download Communicator. Id. at 22.

_____

[9] This reference to the license terms did not contain the actual license terms. Rather, it took the user to a separate page entitled "License & Support Agreements." That page provided the user with a list of hyperlinked license agreements for a variety of Netscape software products. Upon clicking on the correct license agreement, the user could reach the license agreement for Netscape SmartDownload; that license agreement also contained an arbitration clause. Id. at 24.

1    The plaintiffs brought suit, alleging that the SmartDownload software had invaded their

2  privacy by clandestinely transmitting personal information to Netscape. <u>Id.</u> at 21.  Netscape moved

3  to compel arbitration pursuant to the Federal Arbitration Act, contending that plaintiffs had

4  consented to the SmartDownload license agreement, which contained an arbitration clause.  <u>Id.</u> at

5  30.  Applying a "standard of reasonable prudence" under California law, the Second Circuit held

6  that "where consumers are urged to download free software at the immediate click of a button, a

7  reference to the existence of license terms on a submerged screen is not sufficient to place

8  consumers on inquiry or constructive notice of those terms." <u>Id.</u> at 32.  The court rejected

9  Netscape's request to find that the plaintiffs were on inquiry notice of the license agreement.  <u>Id.</u> at

10  32-33.  Rather, the court found, "Reasonably conspicuous notice of the existence of contract terms

11  and unambiguous manifestation of assent to those terms by consumers are essential if electronic

12  bargaining is to have integrity and credibility." <u>Id.</u> at 35.

13    In this case, before being permitted to register for AdWords, Plaintiffs were provided with a

14  scrollable box of "Terms and Conditions."[10]  The first sentence of the "Terms and Conditions" was:

15  "Introduction.  This Agreement between you and Google, Inc. ("Google") consists of these

16  AdWords Select Standard Terms and Conditions ("Terms and Conditions"), the AdWords Select

17  Program (the "Program") Frequently Asked Questions, which may be revised periodically, and the

18  terms of any advertising campaign you submit or modify."  The sentence, "By creating my AdWords

19  Select account, I agree to the above Terms and Conditions," appeared directly below the scrollable

20  box; immediately below that sentence was a button, "Sign me up for AdWords Select."  (Wilburn

21  Dep. Ex. 5.)

22

23  ───────────────

24    [10]  The "Terms and Conditions" do not appear to contain a hyperlink to the "Frequently Asked Questions" that they incorporate by reference.  However, Plaintiffs do not dispute that "[d]uring the sign-up process, advertisers can click on form questions or search for help by entering

25  terms they have questions about.  By clicking on form questions and by entering help terms, Google brings to the screen responsive portions of the Frequently Asked Questions ("FAQs")."  (Plaintiffs'

26  Motion at 4; <u>see also</u> SAC ¶ 26; Answer ¶ 26.)  Accordingly, the Court regards as established for purposes of this motion that Plaintiffs were given the opportunity to browse through the FAQs

27  during the sign-up process.

28                                          14

1    Google clearly presented the Terms and Conditions of the AdWords Agreement to Plaintiffs

2    before they were permitted to sign up for the service. The first sentence of the Terms and

3    Conditions makes clear that the agreement between Google and an advertiser incorporates the

4    Frequently Asked Questions. The layout of the registration page, described above, made clear to

5    potential advertisers (including Plaintiffs) that in clicking the "Sign me up for AdWords Select"

6    button, they were agreeing to Google's Terms and Conditions. As such, the Court finds that

7    Plaintiffs' clicking on the button constitutes a manifestation of consent to the agreement.

8    This case is distinguishable from <u>Specht</u>. The <u>Specht</u> plaintiffs accepted an invitation to

9    download free software with no reference to any license agreement in sight. The Plaintiffs in this

10   action paid a registration fee to enter into a commercial advertising relationship with Google. As

11   such, it was comparatively less reasonable for Plaintiffs to assume that their relationship with

12   Google would not be governed by contractual terms. More importantly, any such assumption on

13   their part was rendered unreasonable by Google's "reasonably conspicuous notice of the existence of

14   contract terms" (including the FAQs, incorporated by reference.) Accordingly, the Court finds that

15   Plaintiffs' clicking on the "Sign me up for AdWords Select" button constituted an "unambiguous

16   manifestation of consent" to the AdWords Agreement.

17   The Court finds that each Plaintiff entered into a contract with Google, the terms of which

18   were: (1) the Terms and Conditions; (2) the Program FAQs (subject to periodic revision);[11] and (3)

19   the terms of each advertising campaign submitted or modified by the Plaintiffs.

20   However, despite the existence of a valid written contract, Google is not entitled to summary

21   judgment on Plaintiffs' breach of contract claim for two reasons. First, Google defined the term

22   "Daily Budget" in pertinent part as "[t]he amount you're willing to spend on a specific AdWords

23

24

25   _____

26   [11] It is not standard practice for a contract's terms to be laid out in the form of frequently
     asked questions. However, in presenting contract terms in question-and-answer format, Google

27   simply increased the likelihood that the terms would be accessible and understandable to advertisers
     without legal training.

28                                                  15

United States District Court
For the Northern District of California

1  campaign each day."  (Jhang Decl., Ex. D.)  However, Google's overdelivery of ads[12] left open the

2  possibility that two groups of customers would be charged, on average, more than their Daily

3  Budget: (1) customers running short-term ad campaigns, for less than one month and (2) customers

4  running longer ad campaigns, where the final month of their campaign is a partial month.  Second,

5  with respect to Google's "pausing" feature, Google represented: "You can also pause your ads

6  completely at any time.  You won't accrue charges while your ads are paused, and they'll remain

7  paused until you resume them."  (Raphael Decl., Ex. B.)  Despite this representation, Google's

8  system considered paused days as underdelivered days until September 2006; this allowed Google to

9  overdeliver on other days and charge advertisers more.  Accordingly, the Court cannot find as a

10  matter of law that Google did not breach its representation that advertisers would not "accrue

11  charges while [their] ads were paused."[13]

12      The Court finds that there exists triable issues of material fact whether Google's overdelivery

13  and pre-September 2006 pausing practices constitute a breach of contract.  Accordingly, the Court

14  denies Google's motion for summary judgment as to Plaintiffs' First Cause of Action for breach of

15  contract.

16  **B.    Breach of Implied Covenant of Good Faith and Fair Dealing**

17      Google moves for summary judgment on Plaintiffs' breach of implied covenant claim on the

18  grounds that (1) it alleges the same facts and seeks the same relief as the breach of contract claim,

19  and as such, is superfluous, and (2) Plaintiffs cannot establish that Google took any "conscious and

20  deliberate act that unfairly frustrates the agreed common purpose of the contract," or that their

21  reasonable expectations were disappointed.  (Google's Motion at 19.)

22

23  _____

24      [12]  The principal issue is that Google's system allows for overdelivery (up to 120 percent of
the Daily Budget) *preceding* underdelivery.  (See, e.g. Schulman Dep. at 54:24-55:15; 59:10-60:3;

25  62:3-11; Venkataraman Dep. at 26:18-23.)  For instance, a customer with a Daily Budget of $10
who wished to run a two-day campaign could be charged up to $24 ($12, or 120 percent of the daily

26  budget, for both days.)

27      [13]  This issue was resolved by Google's September 2006 launch of "Ad Scheduling."

28                                          16

United States District Court

For the Northern District of California

The covenant of good faith and fair dealing is an implied term in every contract under California law; it provides that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Foley v. Interactive Data Corp., 47 Cal. 3d 654, 684 (1988). A breach of the implied covenant of good faith and fair dealing cannot exist without an underlying breach of contract. Love v. Fire Ins. Exchange, 221 Cal. App. 3d 1136, 1151 n.10 (1990). However, if a plaintiff's allegations of breach of the covenant of good faith and fair dealing "do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." Bionghi v. Metropolitan Water Dist. of S. Cal., 70 Cal. App. 4th 1358, 1370 (1999) (quoting Careau & Co. v. Security Pacific Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1395 (1990)).

In this case, Plaintiffs have alleged the following in support of their claim for breach of the implied covenant of good faith and fair dealing:

> A principal benefit for which Plaintiffs and the Class contracted was the ability to control their advertising cost by setting a daily budget and to be charged no more than their daily budget for each day the ad runs. The implied covenant prevents Google from charging Plaintiffs and the Class more than their respective daily budgets . . . The implied covenant prevents Google from converting each advertiser's daily budget into a monthly budget and holding each advertiser liable up to that amount per month, irrespective of whether he/she/it pause their ad (sic).

(SAC ¶¶ 86-92.) These allegations are duplicative of Plaintiffs' breach of contract allegations. As such, the Court finds that Plaintiffs have failed to state an additional claim. The Court grants Google's motion for summary judgment as to Plaintiffs' Second Cause of Action for breach of the implied covenant of good faith and fair dealing.

## C. **Unfair Competition; Untrue and Misleading Advertising**

Google moves for summary judgment on the grounds that (1) the Agreement fully discloses the calculation of the daily budget; (2) Plaintiffs cannot establish reliance on any allegedly false or misleading representations. (Google's Motion at 20-22.) Plaintiff contends that Google violated Section 17500 by misrepresentations concerning the following: (1) the daily budget; (2) the right to

1    pause without being charged; (3) the right to control your own advertising costs; (4) Google's

2    distribution of an ad throughout the day so as not to exceed the daily budget; and (5) the right to be

3    billed no more than your daily budget times the number of days your ad is active.  (Plaintiffs' Notice

4    of Motion and Motion for Partial Summary Judgment at 12-14, hereafter, "Plaintiffs' Motion,"

5    Docket Item No. 80.)  Plaintiff further contends that Google's conduct violates § 17200 by virtue of

6    violating § 17500.  (Plaintiff's Motion at 14.)

7         California's Unfair Competition Law defines unfair competition as any "unlawful, unfair or

8    fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal.

9    Bus. & Prof. Code § 17200.  "'Fraudulent,' as used in the statute, does not refer to the common law

10   tort of fraud but only requires a showing members of the public 'are likely to be deceived.'"

11   Saunders v. Superior Court, 27 Cal. App. 4th 832, 839 (1994) (citing Bank of the West v. Superior

12   Court, 2 Cal. 4th 1254, 1267 (1992)).  In California, a claim for false advertising requires proof that

13   the defendant (1) in connection with the sale of a product or service (2) made an untrue or

14   misleading statement regarding the product or service.  Cal. Bus. & Prof. Code § 17500; Nagel v.

15   Twin Laboratories, Inc., 109 Cal. App. 4th 39, 51 (2003).  Under Section 17500, a statement can be

16   true but misleading.  Id. (citing Day v. AT&T Corp., 63 Cal. App. 4th 325, 332-33 (1998)).  In

17   addition, following the California electorate's passing of Proposition 64 in 2004, a plaintiff must

18   prove (1) injury-in-fact and (2) actual reliance on a defendant's allegedly misleading statements in

19   order to maintain an unfair competition or false advertising law.  Cal. Bus. & Prof. Code §§ 17204,

20   17535.

21        Hanson admitted at his deposition that he has never reviewed the AdWords Frequently

22   Asked Questions.  (Jhang Decl., Ex. A (Deposition of Brett Hanson, hereafter, "Hanson Dep.") at

23   45:18-46:2.)  Stern admitted at his deposition that he did not review the AdWords Frequently Asked

24   Questions prior to registering, and estimated that he had spent less than an hour reviewing them over

25   the course of his three-year advertising relationship with Google.  (Jhang Decl., Ex. B (Deposition of

26   Howard Stern, hereafter, "Stern Dep.") at 57:5-59:24.)  At the time that they registered with

27

28                                          18

United States District Court

For the Northern District of California

1 | AdWords, both Plaintiffs took their understanding of Google's billing practices from the term "Daily

2 | Budget" itself.  (Hanson Dep. at 47:12-48:2; Stern Dep. at 43:23-44:6.)

3 |      Hanson's deposition testimony establishes that he solely relied on the term "Daily Budget" in

4 | deciding to register for AdWords.  Accordingly, the Court finds that the only representation based

5 | on which Hanson has standing to prosecute his Section 17200 and Section 17500 claims is Google's

6 | use of the term "Daily Budget."  Since there exist triable questions of material fact whether Hanson

7 | actually and reasonably relied on the term "Daily Budget" in registering for AdWords, the Court

8 | denies Hanson's motion for summary judgment as to his Section 17200 and Section 17500 claims.

9 |      Stern's deposition testimony establishes that he, too, solely relied on the term "Daily

10 | Budget" in deciding to register for AdWords.  However, his testimony leaves open the possibility

11 | that he reviewed and relied on the AdWords Frequently Asked Questions – particularly the portions

12 | of the Frequently Asked Questions that describe Google's overdelivery and pre-September 2006

13 | pausing practices – to launch one or more ad campaigns at some point during his tenure as an

14 | AdWords advertiser.  Since there exist triable questions of material fact whether Stern actually read

15 | and relied on these portions of the Frequently Asked Questions, the Court denies Stern's motion for

16 | summary judgment as to his Section 17200 and Section 17500 claims.

17 |      Lastly, at this time, the Court declines to find as a matter of law that members of the public

18 | would not be deceived by Google's use of the term "Daily Budget" to refer to the average amount

19 | that an advertiser can expect to pay per day, so long as it runs an ad campaign for a full month.[14]

20 | Accordingly, the Court denies Google's motion for summary judgment as to Plaintiffs' Third and

21 | Fourth Causes of Action for violation of Sections 17200 and 17500.

---

[14]  In light of this finding, the Court need not consider whether Google's descriptions of its overdelivery and pre-September 2006 pausing practices are adequate to satisfy the requirements of Sections 17200 and 17500.

**D.    Unjust Enrichment**

Google moves for summary judgment on Plaintiffs' unjust enrichment claim on the ground that a claim for unjust enrichment does not lie where the parties entered into an enforceable, binding agreement. (Google's Motion at 22.)

Under California law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement defines the rights of the parties. Paracor Finance, Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996) (citing Wal-Noon Corp. v. Hill, 45 Cal. App. 3d 605, 613 (1975)). As the Wal-Noon court explained:

> There cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time. The reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability and to withdraw from one party benefits for which he has bargained and to which he is entitled.

45 Cal. App. 3d at 613.

The Court has already found that Plaintiffs and Google entered into a written (electronic) contract, under which both parties had clearly defined obligations. Accordingly, Plaintiffs cannot recover in quasi-contract for Google's alleged violation of the contract's terms. The Court grants Google's motion for summary judgment on Plaintiffs' Fifth Cause of Action for unjust enrichment.

**E.    Limitation on Recovery**

Google moves to limit Plaintiffs' recovery, contending that Plaintiffs' claims for alleged breaches occurring more than sixty days prior to the date the original complaint was filed are time-barred, because the Agreement established a sixty-day limitations period. (Google's Motion at 23-24.)

The Terms of the AdWords Agreement provide: "To the fullest extent permitted by law, Customer waives all claims related to charges unless claimed within 60 days after the charge . . ." (Jhang Decl., Ex. C ¶ 7.) It is well-established under California law that parties may contract to shorten the limitations period, so long as the shortened period is not "so unreasonable as to show imposition or undue advantage in some way." Beeson v. Schloss, 183 Cal. 618, 622-23 (1920).

California's statute of limitations on breach of contract claims is four years. Cal. Code Civ. Proc. § 337.

It is not clear, as a matter of law, that the use of "claims" in the Terms refers to bringing a lawsuit, as opposed to an advertiser's filing a claim or disputing a charge with Google itself. However, assuming *arguendo* that it does, the Court finds that Google's attempt to shorten the limitations period for a breach of contract claim from four years to two months – particularly without clearly highlighting this limitation for advertisers – is so unreasonable as to show undue advantage. Accordingly, the Court denies Google's motion to limit Plaintiffs' claims, or the claims of putative class members, to those asserted within sixty days of the contested charge.

## V.  CONCLUSION

The Court DENIES Plaintiff's Motion for Partial Summary Judgment. The Court GRANTS Google's Motion for Summary Judgment as to Plaintiffs' Second and Fifth Causes of Action, for breach of the implied covenant of good faith and fair dealing and unjust enrichment. The Court DENIES Google's Motion for Summary Judgment as to Plaintiffs' First, Third, and Fourth Causes of Action for breach of contract and violations of Section 17200 and Section 17500.

The parties shall appear for a Case Management Conference on **September 17, 2007 at 10 AM.** Pursuant to the Civil Local Rules of the Court, the parties shall meet and confer and file a joint case management statement no later than ten (10) days before the date of the conference. The statement shall set forth, *inter alia*, the parties' full discovery plan and schedule.

Dated:  August 21, 2007

_____
JAMES WARE
United States District Judge

**United States District Court**
For the Northern District of California

1

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2

Adel A. Nadji anadji@audetlaw.com
Christopher M. Jhang cjhang@perkinscoie.com

3

David T. Biderman dbiderman@perkinscoie.com
Judith B. Gitterman gittj@perkinscoie.com

4

Lester L Levy llevy@wolfpopper.com
Lisa  Delehunt ldelehunt@perkinscoie.com

5

Michele Fried Raphael mraphael@wolfpopper.com
Ryan M. Hagan rhagan@alexanderlaw.com

6

William M. Audet waudet@audetlaw.com

7

**Dated:  August 21, 2007**                     **Richard W. Wieking, Clerk**

8

9

                                                **By:   /s/ JW Chambers_____**

10

                                                        **Elizabeth Garcia**
                                                        **Courtroom Deputy**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28