CLRB Hanson Industries, LLC et al v. Google Inc. Doc. 209

LESTER L. LEVY (Admitted *Pro Hac Vice)*
MICHELE F. RAPHAEL (Admitted *Pro Hac Vice*)
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093
E-Mail: llevy@wolfpopper.com
E-Mail: mraphael@wolfpopper.com

WILLIAM M. AUDET (117456)
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105-1938
Telephone: (415) 568-2555
Facsimile: (415) 568-2556
E-Mail: waudet@audetlaw.com

MARC M. SELTZER (54534)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
E-Mail: mseltzer@susmangodfrey.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CLRB HANSON INDUSTRIES, LLC d/b/a INDUSTRIAL PRINTING, and HOWARD STERN, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

GOOGLE, INC.,

Defendant.

Case No. C 05-03649 JW

**SUPPLEMENTAL DECLARATION OF MARC M. SELTZER IN SUPPORT OF PLAINTIFFS' BRIEF IN RESPONSE TO GOOGLE, INC.'S OPENING BRIEF RE THE COURT'S ORDER OF AUGUST 21, 2007**

Date: February 25, 2008
Time: 9:00 a.m.
Place: Courtroom 8
Hon. James W. Ware

814885v1/010480 1

**SUPPLEMENTAL DECLARATION OF MARC M. SELTZER IN SUPPORT OF PLAINTIFFS' BRIEF IN RESPONSE TO GOOGLE, INC.'S OPENING BRIEF RE THE COURT'S ODER OF AUGUST 21, 2007**
CASE NO. C 05-03649 JW

Dockets.Justia.com

I, MARC M. SELTZER, declare as follows:

1. I am an active member of the State Bar of California, a member in good standing of the Bar of that Court, a partner in the law firm of Susman Godfrey L.L.P., and one of the attorneys of record for plaintiffs CLRB Hanson Industries, LLC d/b/a Industrial Printing and Howard Stern in this action. I make this declaration on personal knowledge and, if called as a witness, could and would testify competently thereto.

2. Attached hereto as Exhibit A is a true and correct copy of page 49 from the Transcript of Proceedings before the Hon. James Ware on January 22, 2007.

3. Attached hereto as Exhibit B is a true and correct copy of pages 37-39 from the Transcript of Proceedings before the Hon. James Ware on June 21, 2007.

4. Attached hereto as Exhibit C are true and correct copies of pages 42 and 67 from the transcript of the Deposition of Heather Wilburn taken on March 6, 2007.

5. Attached hereto as Exhibit D is a true and correct copy of page 62 from the transcript of the Deposition of Michael Schulman taken on March 7, 2007.

6. Attached hereto as Exhibit E are true and correct copies of the pages cited from the transcript of the Deposition of Howard Stern taken on August 16, 2006.

7. Attached hereto as Exhibit F are true and correct copies of the pages cited from the transcript of the Deposition of CLRB Hanson, by Brett Hanson, taken on August 18, 2006.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of February, 2008, at Los Angeles, California.

/s/ Marc M. Seltzer
MARC M. SELTZER

814885v1/010480

2

SUPPLEMENTAL DECLARATION OF MARC M. SELTZER IN SUPPORT OF PLAINTIFFS' BRIEF IN RESPONSE TO GOOGLE, INC.'S OPENING BRIEF RE THE COURT'S ODER OF AUGUST 21, 2007
CASE NO. C 05-03649 JW

EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| CLRB HANSON INDUSTRIES, LLC d/b/a INDUSTRIAL PRINTING and HOWARD STERN, on behalf of themselves and all others similarly situated, | ) | C-05-03649-JW |
| PLAINTIFFS, | ) | |
| vs. | ) | San Jose, CA January 22, 2007 |
| GOOGLE, INC, | ) | |
| DEFENDANT. | ) | |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JAMES WARE

UNITED STATES DISTRICT JUDGE

over-delivery credit was provided. And --

THE COURT: All right. I hesitate to ask this: Anything further?

MR. LEVY: Well, I just want to do clarify just where we are. They promote the daily budget, and the pausing, as ways to control your costs -- on every given day. This delivery of ads, that's something that Googles to

maximize their revenue. But the way they promote it to the advertiser is: You are in charge of your own budget. You are in charge of your own costs. And if you want to be charged -- run your ad one day a month and your budget is $100; there is no way you should be charged more than $100. And they say they can charge you $120. There's no way to

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| CLRB HANSON INDUSTRIES, ET AL., | ) | C-05-3649-JW |
| PLAINTIFFS, | ) | JUNE 21, 2007 |
| V. | ) | PAGES 1-53 |
| GOOGLE, INC., | ) | |
| DEFENDANT. | ) | |

COPY

THE PROCEEDINGS WERE HELD BEFORE

THE HONORABLE UNITED STATES DISTRICT

JUDGE JAMES WARE

A P P E A R A N C E S:

FOR THE PLAINTIFFS: WOLF POPPER
BY: LESTER L. LEVY
MICHELE FRIED RAPHAEL
845 THIRD AVENUE
NEW YORK, NEW YORK 10022

AUDET & PARTNERS, LLP
BY: MICHAEL MCSHANE
221 MAIN STREET
SUITE 1450
SAN FRANCISCO, CALIFORNIA 94105

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER 8074

THE COURT: SO THE NEXT DAY, INDEED, THERE ARE ONLY 6 CLICKS. AND IF ON THE ADDITIONAL DAY HE HAS 2 ADDITIONAL CLICKS TO HIM AND HE'S BILLED $12 AND ON THE SECOND DAY HE'S ONLY BILLED $10, HE HAS NOW ONLY SPENT MORE THAN HIS BUDGET BUT IF THEY ONLY BILL HIM FOR $6 THAT DAY HE'S UNDER HIS DAILY BUDGET, THEY ALLOWED EXTRA CLICK THROUGHS ON THE FIRST DAY. ARE YOU FOLLOWING ME?

MR. LEVY: I FOLLOW YOU.

THE COURT: ALL RIGHT. WOULD THERE BE A CLAIM AGAINST GOOGLE IF, IF INDEED THAT WERE THE SITUATION, NAMELY, MORE CLICK THROUGH ON THE FIRST DAY THAN WAS BUDGETED BUT LESS FOR THE TOTAL OF THE TWO DAYS?

MR. LEVY: ARE WE TALKING ABOUT PAUSING NOW OR ARE WE TALKING ABOUT PAUSING AT ALL?

THE COURT: I HAVEN'T INTRODUCED HOW. IT JUST HAPPENS THAT THOSE ARE THE EXPERIENCES FOR HIS CLICK THROUGHS.

MR. LEVY: IF WE'RE NOT TALKING ABOUT PAUSING, WHICH IS AN INTENTIONAL STATING I DON'T WANT CLICKS AND TO BE CHARGED THAT DAY, IF WE'RE JUST TALKING ABOUT EVENING OUT THE FLOW.

THE COURT: YES.

MR. LEVY: OKAY. WE BELIEVE THAT, THAT

YOU SHOULD ONLY BE CHARGED YOUR DAILY BUDGET, WHAT YOU EXPECT AND WHAT YOU TOLD THEM YOU WANT TO BE CHARGED. IF THEY GIVE YOU MORE THAN THAT, BECAUSE THE SYSTEM GIVES THEM MORE THAN THAT, YOU SHOULDN'T BE CHARGED MORE THAN THAT.

THE COURT: NO, NO. ANSWER MY HYPOTHETICAL. WE HAVE TWO DAYS OF CHARGES. THE TOTAL ON THE FIRST DAY IS $12 SO YOU DID GO BEYOND IT BUT THE TOTAL ON THE SECOND DAY IS ONLY $6. SO THE TOTAL FOR THE TWO DAYS, YOU'RE UNDER YOUR, YOUR DAILY BUDGET IF YOU ADD THE TWO DAYS TOGETHER. YOU WOULDN'T WANT TO SPEND $20 FOR THOSE TWO DAYS AND YOU INDEED YOU ONLY SPENT 18.

MR. LEVY: WE'RE TALKING.

THE COURT: I'M GIVING YOU THE HYPOTHETICAL. I WOULD SAY IF YOU GO BEYOND YOUR DAILY BUDGET, THAT THE AMOUNT THAT YOU TELL GOOGLE IS THE AMOUNT YOU WANT TO PAY FOR THAT DAY, THAT YOU SHOULD NOT BE CHARGED FOR THAT AND IF THEY GIVE YOU MORE, THEY SHOULDN'T CHARGE YOU THAT.

IT'S LIKE, AS I SAID.

THE COURT: YOU STILL HAVEN'T ANSWERED MY HYPOTHETICAL. I'M TALKING TWO DAYS WHERE YOU ARE CHARGED $18. WOULD THERE BE A CHARGE OR A COMPLAINT AGAINST GOOGLE THAT IT HAS DONE SOMETHING

UNFAIR IF YOU SAY THAT I HAVE A $20 BUDGET FOR
TWO DAYS.  THE FIRST DAY THEY GIVE YOU 12, YOU ONLY
WANTED 10.  THE SECOND DAY YOU ONLY GET 6.  YOU
REALLY ONLY WANTED TO GET 10 THAT SAME DAY AND
SPEND $20 BUT YOU ONLY GET 6 AND THEY BILL YOU FOR
THE, FOR THE 12 FOR THE FIRST DAY AND SECOND FOR
THE SECOND.  THEY HAVE ADDED 20 PERCENT IN THE
FIRST DAY THAT YOU DIDN'T WANT AND YOU DIDN'T GET
THERE ON THE SECOND DAY, YOU ARE BILLED $18, IS
THERE A BREACH OF CONTRACT OR SOMETHING UNFAIR
ABOUT THAT?

      MR. LEVY:  I WOULD SAY YES.  YOU WOULD
SAY NO BECAUSE YOU LOOK AT IT AS AN AVERAGE BUDGET
AND I'M LOOKING AT IT AS A DAILY BUDGET AND IF YOU
GO BEYOND THE BUDGET THE DAY YOU SET YOU SHOULD NOT
BE CHARGED FOR IT.  I KNOW YOU'RE LOOKING AT IT AS
AN AVERAGE.

      THE COURT:  SO YOUR ARGUMENT OR COMPLAINT
IS THAT ONCE THE DAILY BUDGET IS SET, NO MATTER
WHAT IS SET IN THE ABOUT 20 PERCENT OVERAGE, THAT
SHOULD NEVER BE EXCEEDED ON A GIVEN DATE, THAT THEY
SHOULD NOT -- THAT IT'S UNFAIR TO ALLOW THIS
OVERAGE UNDER ANY CIRCUMSTANCES?

      MR. LEVY:  NOT UNFAIR BUT YOU SHOULDN'T
CHARGE FOR IT.

# EXHIBIT C

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

COPY
CONFIDENTIAL

---oOo---

CLRB HANSON INDUSTRIES, LLC )
d/b/a INDUSTRIAL PRINTING, et )
al., )
Plaintiffs, )
vs. ) No. C 05-03649 JW
GOOGLE, INC., )
Defendant. )
)

CONFIDENTIAL TESTIMONY - PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF HEATHER WILBURN

TUESDAY, MARCH 6, 2007

PAGES 1 - 82

BY MS. RAPHAEL:

Q Okay.

Will Google allow an advertiser's ad to accrue charges up to 120 percent above its daily budget on any given day?

MR. BIDERMAN: Objection; vague.

THE WITNESS: Could you restate that?

BY MS. RAPHAEL:

Q Sure.

Will Google overdeliver an ad to up to 20 percent above a daily budget on any given day?

A Potentially deliver.

Q "Yes" or "no"? That's the question.

A Potentially deliver.

Q Correct, that's the question. Is the answer "yes" or "no"?

MR. BIDERMAN: Objection; vague. The answer to what? Let's get a question.

MS. RAPHAEL: Can you repeat the question?

(Record read as follows:

"Q Will Google overdeliver an ad to up to 20 percent above a daily budget on any given day?")

THE WITNESS: Potentially, yes.

THE WITNESS: Due to web fluctuations, it is possible to accrue clicks, charges beyond 20 -- up to 20 percent beyond that daily budget limit.

But at the end of the month, when we charge, we see if there is anything beyond. Anything being charges beyond daily budget times the number of days in the month will be given back as an overdelivery credit.

BY MS. RAPHAEL:

Q Does that accrual apply to any given day in the billing cycle?

MR. BIDERMAN: Objection; vague.

THE WITNESS: Accrual being any time the ad is active.

BY MS. RAPHAEL:

Q Okay.

How does the Google AdWords system account for days that an ad is paused when you look back at the end of the month?

A How do we account for it?

Q Correct.

MR. BIDERMAN: Objection; vague.

THE WITNESS: Whatever the number of days are in that month, multiplied by whatever the daily budget was during that time frame, is the amount that we're assuming the advertiser wanted to spend during that time

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

COPY

CLRB HANSON INDUSTRIES, LLC d/b/a INDUSTRIAL PRINTING, and HOWARD STERN, on behalf of themselves and all others similarly situation,

Plaintiffs,

vs.

GOOGLE, INC.,

Defendants.

Case No. C05-03649 JW

DEPOSITION OF MICHAEL SCHULMAN
WEDNESDAY, MARCH 7, 2007

REPORTED BY: SANDRA LEHANE, CSR 7372

longer." What's your understanding of what's meant by "hang on to it any longer"?

A. So if for, you know, the reasons that we talked about earlier, on -- let's say on the first day, by chance they served $104.50 because of this time delay or some other issue. We won't charge them for that 4.50. What we will do is keep it in what I like to call limbo. And in that -- if, say, on the next day, they only served $90 due to traffic patterns or other things like that, then that $4.50 is then used to fill in that gap. So if, for some reason, which is, you know, very rare -- overdelivery itself is a very small amount of our delivery, or of our revenue, you know, at the end the delivery period that limbo at the end of the month or end of the delivery period is automatically considered overdelivery because it is now -- delivery period has ended and anything in limbo has to be overdelivery.

Q. Overdelivery cannot be carried on to the next delivery period?

A. No.

Q. I thought you had said earlier in the day a delivery period -- there was no end to a delivery period. Did I get that wrong?

A. So there is a set date, you know. Sometimes

# EXHIBIT E

ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CLRB HANSON INDUSTRIES, LLC, etc., et al.,

Plaintiffs,

v.

GOOGLE, INC.,

Defendant.

Case No. 05-03639 JW

DEPOSITION OF HOWARD STERN

August 16, 2006

227871

BARKLEY Court Reporters

(310) 207.8000 Los Angeles
(949) 955.0400 Orange County
(415) 433.5777 San Francisco
(916) 922.5777 Sacramento
(408) 885.0550 San Jose
(951) 686.0606 Inland Empire
(818) 702.0202 San Fernando Valley
(858) 455.5444 San Diego
(760) 322.2240 Palm Springs

14:34 spreadsheet is showing.

14:34 Q. Right. And you believe you were overcharged because you were charged more than 120 percent of your daily budget; correct?

14:34 A. Partially correct. I was charged over my daily budget, which is often not over 20 percent, but over the budget. So I definitely was charged both over my budget and 20 percent over my budget.

14:35 Q. Right. Okay. Now, first, going back to this. With respect to -- okay. Putting that aside, do you know -- and perhaps let me just ask the question again.

14:35 Do you know, as we sit here today, whether, in fact, you have been charged in excess of the amount of the daily budget times the number of days that your campaign was unpaused during the course of a month?

14:35 A. I don't remember doing that specific calculation.

14:35 Q. And whether you've done the calculation or not, do you know, as we sit

14:35 here today, whether you have been charged in
14:35 excess of that amount?

14:35 A. I don't know.

14:36 Q. And is there any reason you have
14:36 not run such a calculation?

14:36 A. I was concentrating mainly on
14:36 the daily budget. So I didn't do any other
14:36 calculation. What struck me as being
14:36 something that shouldn't have occurred was
14:36 the fact that on 97 days I was charged more
14:36 than I thought I was going to be charged. I
14:36 wasn't interested in multiplying it by the
14:36 number of days active.

14:36 On a day-by-day calculation,
14:36 which is the way I view this charging to
14:36 occur, I was charged more than my daily
14:36 budget. I wasn't calculating things on a
14:36 monthly basis. This whole thing was
14:36 presented as a daily budget, and a daily
14:36 calculation is what was important.

14:36 Q. And have you ever received any
14:36 assistance from anyone in terms of learning
14:37 how to use the AdWords program?

14:37 A. Nothing more than I figured out

BARKLEY Court Reporters

15:06 daily budget specifies."

15:06 Do you see that?

15:06 A. Yes.

15:06 Q. And your understanding, that's part of the FAQ's; correct?

15:06 A. Along with part one, "What is a daily budget."

15:06 Q. Right.

15:06 A. Yes.

15:06 Q. And you understand that the FAQ's are part of the terms and conditions of your relationship with Google; correct?

15:06 A. Yes. They're part of the agreement.

15:06 Q. And is it your position that, notwithstanding that language, if Google delivers and charges you for $11 worth of advertising on a day in which you have a daily budget of 10, that even though that is less than 120 percent of your daily budget, it is your position today that Google has violated the terms and conditions of its relationship with you?

.5:07 A. Yes. For two reasons. One is,

15:18 credits. But apparently I might have received some overdelivery credits. But whatever they were, they obviously weren't what I thought they would be.

15:18 Q. And then -- and is it your position that after this correspondence that occurred on November -- culminating in the e-mail that's the top of Exhibit 3, November 20, 2003, is it your position that after that correspondence you continued to believe that your agreement with Google was that Google would never charge you on a daily basis more than your daily budget?

15:19 A. Yes. I still believe it as I'm sitting here today, and it's still in the FAQ's that every day should have a daily budget that wouldn't be exceeded.

15:20 MR. BIDERMAN: Why don't we take a five-minute break. I'll talk to Chris, we'll see where we are.

15:20 THE VIDEOGRAPHER: The time is 3:23 p.m. We're off the record.

15:20 (Recess taken.)

15:35 THE VIDEOGRAPHER: The time is

BARKLEY

H. Stern

15:35 3:38 p.m. We're back on the record.

15:35 BY MR. BIDERMAN:

15:35 Q. Just so I have a clear record,
15:35 can you tell me every document -- oops. What
15:35 am I doing wrong?

15:35 THE VIDEOGRAPHER: Your
15:35 microphone.

15:35 (Discussion off the record.)

15:35 Q. Can you tell me, sir, every
15:35 reason why you believe that Google is
15:35 violating the terms and conditions of its
15:35 agreement with you when it charges more than
15:35 your daily budget?

15:36 A. Well, the first is that they
15:36 present themselves as allowing you to set a,
15:36 quote, daily budget. And you would think or
15:36 at least I think, and still think today, that
15:36 that's the most you're going to be charged
15:36 that day. So when I get charged more than
15:36 that I feel it's a violation.

15:36 Second is that it seems that
15:36 there are terms in the FAQ's as of today,
15:36 although I can't recall what they were like
15:36 when I signed up, that on the one hand say

H. Stern

15:36 you have a daily budget that you're not going to have exceeded in one paragraph, and then in another paragraph they talk about a monthly budget, which has nothing to do with a daily budget. And they seem to be billing you on their monthly billing interpretation, when I'm looking at the daily budget interpretation, which is what I key in on.

15:36 Q. What you personally key in on?

15:36 A. What I believe is the whole point of this AdWords program is that it's a daily type of complete-control advertising scheme, where you have very fine control over your charges down to the daily level, and that's what they present as -- as the main feature of their program. And yet they, on the back end at the end of the month, they sort of throw that out and just charge you monthly.

15:37 Q. Okay. And you will agree that after your correspondence in November 20th, 2003, which is the last document we talked about, you understood that, notwithstanding what you believed to be the case, Google

16:27 A. Yes.
16:27 Q. Is that an incentive for you to sign up for AdWords?
16:27 A. Right. It's a good reason, right.
16:27 Q. And then it goes on to say, "This is the same no matter how you choose to pay for your advertising."
16:27 Do you see that?
16:27 A. Yes.
16:27 Q. Okay. So why did you switch to Google from Yahoo?
16:27 A. Because Yahoo had a monthly minimum that I needed to pay, whether or not I even ran the ads.
16:27 Q. And Google?
16:27 A. They had no minimum.
16:27 Q. And, in fact, they told you they had no minimum; correct?
16:28 A. Right.
16:28 MR. BIDERMAN: Objection. Assumes facts not in evidence.
16:28 MR. LEVY: Do you want to change the tape now?

BARKLEY Court Reporters

# EXHIBIT F

ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CLRB HANSON INDUSTRIES, LLC, etc., et al.,

Plaintiffs,

v.

GOOGLE, INC.,

Defendant.

Case No. 05-03639 JW

CONFIDENTIAL PORTIONS

30(b)(6) DEPOSITION OF BRETT R. HANSON

August 18, 2006

228010

BARKLEY
Court Reporters

(310) 207.8000 Los Angeles (916) 922.5777 Sacramento (818) 702.0202 San Fernando Valley
(949) 955.0400 Orange County (408) 885.0550 San Jose (858) 455.5444 San Diego
(415) 433.5777 San Francisco (951) 686.0606 Inland Empire

B. Hanson

0:08 an AdWords program, and entered the information that was requested of me.

0:08 Q. And this is sometime in July 2002, as best as you recall?

0:08 A. Yes, sir.

0:08 Q. And did you review any materials on the Google site before you made the decision to join the AdWords program?

0:08 A. I remember the page -- the sign-up page saying it was an easy-to-use pay-for-click program. That it was a -- we controlled the -- the program from a -- from a budget standpoint. We controlled the cost per click. We controlled the daily budget. And that's what intrigued me to the value proposition that Google offered at that time.

0:09 Q. And when did you first see the page that you just described?

0:09 A. I think it's the first page that was presented to me.

0:09 Q. Okay. As part of the AdWords sign-in?

0:09 A. Yes, sir.

0:09 Q. And had you reviewed any

0:20 has that button on it.

0:20 MR. BIDERMAN: I'm asking if he

0:20 remembers it.

0:20 MR. LEVY: Okay.

0:20 A. I do not recall a specific

0:20 button.

0:21 Q. And do you otherwise recall in

0:21 some manner signifying that you accepted the

0:21 terms and conditions of the AdWords program?

0:21 A. I do not.

0:21 Q. And in your mind, whether you

0:21 have that recollection or not, did you

0:21 understand that by signing on to the AdWords

0:21 program that you were accepting the terms and

0:21 conditions by which the AdWords program

0:21 operated?

0:21 A. In my mind, I was accepting the

0:21 terms and conditions that controlled my daily

0:21 budget. I controlled my cost per click. I

0:21 could turn off and on my campaign, and I

0:21 would not be charged more than my daily

0:21 budget or my daily cost per click.

0:21 Q. Okay. And did you believe that

0:21 you were accepting anything else?

B. Hanson

0:44 MR. BIDERMAN: We've been going about an hour. Do you want to take like four, five minutes?

0:44 MR. LEVY: Sure.

0:44 THE VIDEOGRAPHER: The time is 10:44 a.m. We're off the record.

0:44 (Recess taken.)

0:55 THE VIDEOGRAPHER: The time is 10:55 a.m. We're back on the record.

3:59 BY MR. BIDERMAN:

0:55 Q. And just one question while we're getting a document. With respect to the daily budget, how -- what is your understanding of how a daily budget works on the Google AdWords program?

0:55 A. That whatever our budget is we'll not be charged more than that certain amount.

0:55 Q. Okay. And how did you come to that understanding?

0:55 A. That's what was presented to me by Google.

0:55 Q. In what form?

0:55 A. The on-line page. The initial

there were -- let me just mark the others.

MR. BIDERMAN: Withdrawn.

Sorry, Amy.

Q. How did you select the days that you selected for these particular exhibits, 29, 28, 27?

A. I believe I was asked by CLRB at the time why the budgets were going over, and -- and I think I wanted to show counsel that there was just a continual -- you know, no matter what we set the budget at, it always went over. It didn't matter if I set it at $1, $100. Would go over.

Whatever the budget was, it went over. It seemed to be. And it was frustrating to convey that to the client, when the client says, I want to spend $100 and the client pulls up a report and it's $121 or it's always consistently over. I mean, it looks like I don't have a clue what's going on.

Q. And when you say you were asked by CLRB, who asked you this question?

A. Cindy Hanson.

BARKLEY Court Reporters

3:43 day we were going over budget.

3:43 Q. Right. I understand. Is it fair to say that at some time in the second quarter of 2004 you came to the understanding that it was Google's practice under the AdWords program to charge up to 20 percent above the specified daily budget amount for a given day?

3:43 A. No, sir. No, sir.

3:44 Q. Okay. You did come to that understanding at some point in time; right?

3:44 A. That wasn't the question you asked me.

3:44 Q. Okay. Okay. Have you ever come to an understanding that Google's policy and practice under the AdWords program is to charge up to 120 percent of the daily budget?

3:44 A. As recently as -- I've kind of caved in and gave in that that's how Google's going to treat their advertisers, is going to screw them by 20 percent in the last, let's say, last June, 2005. Because I wasn't getting anywhere with asking them for, you know, why is this happening. It didn't

BARKLEY Court Reporters

B. Hanson

3:45 matter what I changed the daily budget to, it always went over.

3:45 Q. Okay. So it's fair to say you came to that understanding sometime, say, June 2005?

3:45 A. Yes.

3:45 Q. And with respect to Exhibits 39 and 38, the communications with Tina, did you speak to her by phone?

3:45 A. I don't know if Google has phones. No. E-mail.

3:45 Q. And have you ever spoken to anyone at Google by telephone?

3:46 A. Recently, I believe, I received a voicemail. In fact, on Monday, thanking us for our business from a Matt. I don't know, Matt something left on my voicemail.

3:46 Q. And anything other than that communication?

3:46 A. Not that I can recall.

3:46 Q. I thought -- have you ever spoken to anyone by phone or otherwise at Google about daily budget issues?

3:46 A. I think I -- let me refresh my

BARKLEY Court Reporters