United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CLRB Hanson Industries, LLC, et al., | NO. C 05-03649 JW |
| Plaintiffs, v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Google Inc., | |
| Defendant. / | |

## I. INTRODUCTION

CLRB Hanson Industries LLC ("Hanson") and Howard Stern ("Stern") (collectively, "Plaintiffs") bring this putative class action against Defendant Google, Inc. ("Google"), alleging, *inter alia*, breach of contract and violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*

Presently before the Court is Google's Motion for Partial Summary Judgment regarding its practice of charging AdWords customers up to 120% percent of their "Daily Budget."[1] The Court

---

[1] At the December 3, 2007 Case Management Conference, the parties informed the Court that they disagreed whether the Court's August 21, 2007 Order on the parties' cross-motions for partial summary judgment resolved this issue. (Docket Item No. 201.) Thus, the Court ordered further briefing. (Id.) Google requests relief as matter of law that 120% delivery cannot form the basis for a claim, while Plaintiffs contend that such a claim remains in the case. (Google's Opening Brief Regarding the 120% Rule, hereafter, "PSJ Motion," Docket Item No. 202; Plaintiffs' Supplemental Submission Re the Court's Order of August 21, 2007, hereafter, "PSJ Opposition," Docket Item No. 205.) The Court construes Google's brief as a further motion for partial summary judgment and Plaintiffs' brief as an opposition to that motion.

conducted a hearing on February 26, 2008. Based on the papers submitted to date and oral arguments of counsel, the Court GRANTS in part and DENIES in part Google's Motion.

## II. BACKGROUND

On August 3, 2005, Plaintiffs filed this putative class action. (Notice of Removal, Docket Item No. 1, Ex. A-1.) A detailed outline of the facts of this case and Google's technology may be found in the Court's August 21, 2007 Order. (See Docket Item No. 193.) The Court reviews the facts relevant to the present motion.

### A. Background

Hanson is a Minnesota limited liability corporation. (Second Amended Class Action Complaint ¶ 8, hereafter, "SAC," Docket Item No. 47.) Stern is a New Jersey citizen. (SAC ¶ 9.) Google is a Delaware corporation with its principal place of business in California. (SAC ¶ 10; Defendant Google Inc.'s Answer to Plaintiffs' Second Amended Class Action Complaint ¶ 10, hereafter, "Answer," Docket Item No. 62.) Hanson began running campaigns using Google's ad service in July 2002, and Stern began running campaigns in October 2003. (SAC ¶¶ 56-68.)

Google provides a widely used Internet search engine service located at http://www.google.com. (SAC ¶ 11; Answer ¶ 11.) Users type words ("search terms") into a search box on Google's search screen; the search engine returns a search results page with links to websites that contain the search terms. The search results page also contains a "Sponsored Links" section, which contains links to the websites of businesses who provide the services, or sell the products, described by the search terms that users input.[2] "Sponsored Links" are advertisements of the customers who sign up for, and pay for, Google's global advertising program ("AdWords"). (Id.; see also SAC ¶ 14; Answer ¶ 14; Statement of Undisputed Facts ¶¶ 1-2, hereafter, "SUF," submitted under seal.)

---

[2] "Sponsored Links" advertisements also appear "in similar locations on the search and content sites and products in the Google network." (SAC ¶ 11; Answer ¶ 11.)

2

Customers enroll in AdWords by signing up online. (SUF ¶ 4; SAC ¶ 19; Answer ¶ 19.) During the registration process, a customer (1) creates its ad text (the text of the advertisement that will appear with the search result); (2) selects keywords that will trigger the display of the ad;[3] (3) selects geographic locations to target; (4) sets a maximum cost-per-click to spend when someone clicks on the ad; and (5) sets a Daily Budget. (SUF ¶¶ 6, 9; SAC ¶¶ 22, 30; Answer ¶¶ 22, 30.) To create the AdWords account itself, a customer must provide an email address, choose a password, and select a method of billing. (SUF ¶ 8; SAC ¶¶ 22-25; Answer ¶¶ 22-25.)

During the sign-up process, customers can click on form questions or search for help by entering terms for which they have questions. (SUF ¶ 7; SAC ¶ 26; Answer ¶ 26.) In each case, Google responds with relevant portions of the Frequently Asked Questions ("FAQs"). Id. AdWords states that it gives customers the right to set their own daily budget as a method of cost control. (SUF ¶ 13; SAC ¶ 32; Answer ¶ 32.) On an AdWords webpage titled "AdWords Advantages," Google represents as follows:

(1) Customers can "[f]ully control [their] ad budget" (SUF ¶ 13; SAC ¶ 16; Answer ¶ 16);

(2) If an AdWords customer accrues clicks that would result in charges of more than 20 percent above a customer's Daily Budget in a single day, the AdWords system is designed to provide an overdelivery credit (SUF ¶ 15);

(3) If an ad campaign accrues clicks that would result in charges exceeding more than the number of days in the month multiplied by the customer's Daily Budget, the AdWords system will provide the customer with an overdelivery credit for the charges at the end of the month (SUF ¶ 16).

**B.  Procedural History**

On September 12, 2005, Google removed this action to federal court on the basis of diversity jurisdiction. (See Docket Item No. 1.) The operative complaint is Plaintiffs' Second Amended Class Action Complaint, filed on May 4, 2006. In their Second Amended Class Action Complaint, Plaintiffs allege five causes of action: (1) breach of contract; (2) breach of the implied covenant of

---

[3] The "keywords" trigger the ad to run when an Internet user inserts a search into the Google search engine which includes those keywords. (SAC ¶ 22; Answer ¶ 22.)

3

good faith and fair dealing; (3) violation of Cal. Bus. & Prof. Code § 17200 *et seq.*; (4) violation of Cal. Bus. & Prof. Code § 17500 *et seq.*; and (5) unjust enrichment.

On August 21, 2007, the Court granted Google's motion for summary judgment as to Plaintiffs' Second and Fifth Causes of Action, and denied Google's motion as to Plaintiffs' First, Third, and Fourth Causes of Action. (August 21, 2007 Order, Docket Item No. 193.) In that Order, the Court also found that a valid advertising contract exists between the parties (the "AdWords Agreement"), which includes both the Terms and Conditions and the FAQs. (Id.)

Presently before the Court is Google's motion for partial summary judgment regarding its practice of charging AdWords customers up to 120% percent of their "Daily Budget."

### III. STANDARDS

Although motions for partial summary judgment are common, Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, does not contain an explicit procedure entitled "partial summary judgment." As with a motion under Rule 56(c), partial summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of partial summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact." Id. at 323. The non-moving party must then identify specific facts "that might affect the outcome of the suit under the governing law," thus establishing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

When evaluating a motion for partial or full summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is

4

1 accorded. See, e.g. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992). The court
2 determines whether the non-moving party's "specific facts," coupled with disputed background or
3 contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.
4 T.W. Elec. Serv., 809 F.2d at 631. In such a case, partial summary judgment is inappropriate.
5 Anderson, 477 U.S. at 248. However, where a rational trier of fact could not find for the non-
6 moving party based on the record as a whole, there is no "genuine issue for trial." Matsushita Elec.
7 Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

Google moves for partial summary judgment on the grounds that its practice of charging customers up to 120% of their "Daily Budget" cannot, in and of itself, form the basis for (1) Plaintiffs' breach of contract cause of action or (2) their unfair competition causes of action. (PSJ Motion at 13.) The Court addresses each of these contentions in turn.

**A.     Breach of Contract**

Plaintiffs contend that Google's practice of charging customers up to 120% of their "Daily Budget" constitutes a breach of the AdWords Agreement because the agreement implies that customers will not be charged more than their "Daily Budget" on any given day. (PSJ Opposition at 15.)

Under California law, interpretation of the language of a contract is a question of law, to be determined exclusively by the court. See Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18 (1995). The court interprets a contract "to give effect to the mutual intention of the parties." Foster-Gardner, Inc. v. National Union Fire Ins. Co., 18 Cal. 4th 857, 868 (1998). Since intent is inferred, if possible, "solely from the written provisions of the contract . . . , [i]f contractual language is clear and explicit, it governs." Id. Only when terms are ambiguous, does the court look to extrinsic evidence to aid interpretation, while straining not to find ambiguity where none exists. Waller, 11 Cal. 4th at 19.

In its August 21, 2007 Order, the Court found that the AdWords Agreement is a valid advertising contract between the parties, which includes both the Terms and Conditions and the FAQs.[4] A customer creating an AdWords account in accordance with the AdWords Agreement must specify a "Daily Budget," which Google defines in its AdWords Glossary as follows:

> The amount you're willing to spend on a specific AdWords campaign each day.
>
> AdWords displays your ad as often as possible while staying within your daily budget. When the budget limit is reached, your ads will typically stop showing for that day. How quickly your ads are shown during a given day is determined by your ad delivery setting.[5]

"Daily Budget" is the very first word listed in the AdWords Agreement Glossary. (Selzter Decl., Ex. D.) While this definition may imply that customers will not accrue a charge over what they set for their "Daily Budget" on any particular day, directly below the statement (and still within the section defining "Daily Budget") the AdWords Glossary goes on to state:

> On any single day, the AdWords system may deliver up to 20% more ads than your daily budget calls for. This helps make up for other days in which your daily budget is not reached. However, you'll never be charged more than your average daily budget over the course of a month. For example: if your daily budget is $10 and the month has 30 days, you might be charged up to $12 on any single day but your monthly charges will never exceed $300. (Id.)

Thus, any customer looking up the meaning of "Daily Budget" could see from the plain language of the AdWords Agreement Glossary that overdelivery is built into the AdWords system and part of the contracted for advertising service.

Similarly, the AdWords Agreement FAQs section, which was in effect when each of the Plaintiffs enrolled in AdWords, answered two hypothetical questions regarding the meaning of "Daily Budget" in much the same way as the Glossary. For example, the first two questions and

---

[4] (See August 21, 2007 Order at 15.) Specifically, the Court found, "[E]ach Plaintiff entered into a contract with Google, the terms of which were: (1) the Terms and Conditions; (2) the Program FAQs (subject to periodic revision); and (3) the terms of each advertising campaign submitted or modified by the Plaintiffs." (Id.)

[5] (Declaration of Marc M. Seltzer, Ex. D, hereafter, "Selzter Decl.," Docket Item No. 206.) This definition of "Daily Budget" was taken from Google's FAQs printed August 14, 2006. Id.

6

answers under the section labeled "Account Set Up: Daily Budget" when Plaintiff Stern enrolled in AdWords were as follows:

> **1. What is a daily budget?**
>
> A daily budget enables you to set a limit on the amount you spend each day. You set a separate daily budget for each of your campaigns. Since you only pay when someone clicks on your ads, you won't necessarily reach the daily budget limit you set.
>
> . . .
>
> **2. Why did I receive more clicks than my daily budget on a particular day?**
>
> Traffic is not constant from day to day. For example, fewer people search the Web on weekends than during the week. To account for this and maximize the potential of your advertising, Google may allow up to 20% more clicks in one day than your daily budget specifies.
>
> If you budget $100 per day in a 30-day month, you may receive more than $100 in clicks on a given day, but the maximum you would pay is $3000 for that month. If we do overdeliver clicks, you will receive a credit . . . .[6]

The "Account Set Up: Daily Budget" section of the FAQs makes explicit reference to the possibility that AdWords customers may be charged up to 120% of their "Daily Budget." Thus, the question and answer format of the FAQs section allows any customer investigating the meaning of "Daily Budget" to quickly determine the meaning of the term.

Plaintiffs contend that while Google "prominently and repeatedly" referred to a "Daily Budget" and promised customers that it would stay within the customers' own set "Daily Budget," it obscured "any possible reference to overdelivery." (PSJ Opposition at 16.) However, in the two instances shown above, the AdWords Agreement states that Google "may deliver up to 20% more ads than your daily budget calls for" and that customers "may be charged 20% more clicks in one day than [the customer's] daily budget specifies." In each instance, the AdWords Agreement discloses Google's practice of charging up to 120% of a customer's "Daily Budget" directly under

---

[6] (Selzter Decl., Ex. A at GOOG-HN 20888.) The AdWords Agreement FAQs section in effect when Hanson enrolled contains almost identical language. (Id., Ex. B at GOOG-HN 20904.)

7

the definition of "Daily Budget" in way that is equally as prominent and accessible as the definition of "Daily Budget."

Under the plain language of the AdWords Agreement, Google is not in breach of the "Daily Budget" provision if the following two things are true: (1) in any particular day in which a customer's ad campaign is running, Google charges that customer no more than 120% of his or her "Daily Budget;"[7] and (2) in any particular month in which a customer's ad is running, Google charges a customer no more than his or her "Daily Budget" multiplied by the days in which the ad ran in the month. Accordingly, the Court finds that Google's practice of charging customers up to 120% of their "Daily Budget" does not, in and of itself, constitute a breach of the AdWords Agreement.[8]

However, as the Court found in its August 21, 2007 Order, there remain triable issues of fact as to whether Google breaches the AdWords Agreement with respect to three groups of individuals: (1) customers running short-term ad campaigns, for less than one month; (2) customers running longer ad campaigns, where the final month of their campaign is a partial month; and (3) customers who pause their campaigns. (August 21, 2007 Order at 16.) Members of these groups may be entitled to recover for breach of contract if they can show that they were charged more than their "Daily Budget" multiplied by the number of days in which their ad campaigns were running.

---

[7] However, it appears that the Agreement only authorizes an over charge of up to 120% of a customer's daily budget to make up for a prior shortfall. (Selzter Decl., Ex. D.)

[8] While the Court finds that Google's practice of charging up to 120% of a customer's Daily Budget, in and of itself, does not constitute a breach contract, this finding does not reach any practice of Google to over-serve and end up charging up to 120% of a customer's Daily Budget on one day and then to intentionally under-serve and therefore undercharge a customer on another day. For example, in a hypothetical two-day month, if Google were to over-serve and end up charging a customer 120% of the customer's Daily Budget on the first day, it may be a breach of contract for Google to intentionally under-serve and end up charging a customer 80% of the customer's Daily Budget on the second day.

8

## B. Unfair Competition and False Advertising Laws

Plaintiffs contend that Google's use of the term "Daily Budget" constitutes false advertising in violation of California Unfair Competition Law because Google calculates charges based on a monthly budget, charging up to 120% of a customer's "Daily Budget." (PSJ Opposition at 12.)

California Unfair Competition Law defines unfair competition as any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code §§ 17200, 17500. In California, a claim for false advertising requires proof that the defendant, in connection with the sale of a product or service, made an untrue or misleading statement regarding the product or service. Cal. Bus. & Prof. Code § 17500; Nagel v. Twin Laboratories, Inc., 109 Cal. App. 4th 39, 51 (2003). Under § 17500, a statement can be true but still be misleading withing the meaning of the statute. Id. (citing Day v. AT&T Corp., 63 Cal. App. 4th 325, 332-33 (1998)).

The standard to be applied in assessing whether a statement is false or misleading within the meaning of §§ 17200 and 17500 is whether it is "likely to deceive" the consumer. See Lavie v. Procter & Gamble Co., 105 Cal. App. 4th 496, 507-08 (2003). To determine whether a statement is likely to deceive, the court is to use a "reasonable consumer" standard, i.e., "that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." Id. at 508. A clearly disclosed term or practice is not likely to deceive a consumer. Wayne v. Staples, Inc., 135 Cal. App. 4th 466, 483-84 (2006). Whether a business practice constitutes a breach of contract is a separate inquiry from whether the practice violates Unfair Competition Law. R & B Auto Center, Inc. v. Farmers Group, Inc., 140 Cal. App. 4th 327, 356 (2006). In other words, even if a practice does not breach the express terms of a contract between the parties, it may still be actionable as a misleading business practice. Id.

Google presents evidence that its practice of charging customers up to 120 % of their "Daily Budget" is clearly disclosed during the AdWords sign up process. (Declaration of Heather Wilburn in Support of Goolge's PSJ Motion, Ex. A, Docket Item No. 204.) This evidence comes in the form

of a screen shot showing the "Specify your daily budget" screen of the AdWords sign up webpages from sometime in "the 2002 period," which states:

> Just enter what you'd like to spend per day in the 'Daily Budget' box, and Google will show your ad evenly throughout the day. Your actual daily charges may fluctuate by 20% because of changing search volume, but the maximum you will spend in a 30-day calendar month should be no more than 30 times your daily budget. (Id.)

However, Google neither gives the exact dates in which the screen shot it provides would have been shown, nor evidence that Plaintiffs actually saw the same sign up webpages when they signed up.[9] Plaintiff Hanson alleges it originally began running AdWords campaigns in 2002, and its 30(b)(6) representative testified that Google's practice of charging up to 120% of Hanson's "Daily Budget" was not apparent until certain email communications from a company representative were received in March 30, 2005. (SAC ¶ 56; Declaration of M. Christopher Jhang, Ex. A at 135:20-137:15, 169:16-170:15, hereafter, "Jhang Decl.," Docket Item No. 90.) Plaintiff Stern similarly testifies that he was not aware of Google's practice of charging up to 120% of a customer's "Daily Budget" when he began running AdWords campaigns. (Jhang Decl., Ex B at 81:21-82:10.)

Thus, the issue becomes whether a reasonable consumer would have been misled by the term "Daily Budget" such that the consumer would suffer injury by being charged up to 120% of his or her "Daily Budget" on a single day. Plaintiffs present evidence that "Daily Budget" may reasonably be interpreted as meaning a maximum set amount that Google will charge on any particular day. For example, in various iterations of the AdWords Agreement, Google represents the following:

> You have complete control over how long you participate in AdWords, and you control the maximum you want to spend per day. (Seltzer Decl., Ex C. at 012.)

> You have complete control over how much you spend and how you spend it. You choose the maximum cost-per-click (CPC) and the daily budget that fit your advertising goals. (Id., Ex. A at GOOG-HN 20825, Ex. B at GOOG-HN 20837.)

> You also control your overall spending by setting a daily budget (how much you want to pay per day).

---

[9] At the hearing on Google's motion, counsel for Plaintiffs objected to this screen shot under Fed. R. Civ. P. 56(e). Since Google did provide a supporting witness which had personal knowledge that the screen shot was actually shown to customers during the relevant time frame, the Court sustains Plaintiffs' objection.

10

> . . .
> If your daily budget is lower than the recommended amount, Google will deliver your ads evenly throughout the day to keep your clicks at or below your daily budget. (Id., Ex. A at GOOG-HN 20906.)

These statements suggest that AdWords customers have control over their "Daily Budget." The statements may also reasonably be interpreted as implying, if not outright affirming, that the "Daily Budget" is the maximum charge customers will incur on any given day that they have an active campaign. The Court finds that a reasonable consumer could be misled by these statements unless Google's practice of charging up to 120% of a customer's "Daily Budget" would have been apparent to an ordinary consumer.

As noted above, "Daily Budget" is defined in the AdWords Agreement as allowing for the possibility of overdelivery of 120% on any given day. (Id., Ex. D, Ex. A at GOOG-HN, Ex. B at GOOG-HN 20904.) However, Google has not provided sufficient evidence that the disclosure of its practice of charging up to 120% of a customer's "Daily Budget" is so prominent that a reasonable consumer would necessarily view it. Instead, the disclosure is located well within the AdWords Agreement, a document over 100 pages long. (See id., Ex. C.)

Accordingly, the Court finds that there are triable issues of fact as to whether Google's use of the term "Daily Budget," while charging up to 120% of a customer's "Daily Budget," constitutes false advertising in violation of California Unfair Competition Law."[10]

## V. CONCLUSION

The Court GRANTS in part and DENIES in part Google's Motion for Partial Summary Judgment.

---

[10] While not directly at issue in the parties' briefs, there are triable issues of facts as to whether a customer, who does not belong to one of the three groups discussed at the end of Section IV.A., *supra*, would suffer actual injury from relying on disclosures that "Daily Budget" means a maximum amount charged per day. (See Seltzer Decl., Ex. C at 012.) For instance, the system could result in "overexposure" on certain days, which could create difficulties in meeting demand and maintaining customer satisfaction. (See Seltzer Decl., Ex. G.)

11

The Court grants Google's motion with respect to whether the practice of charging customers up to 120% of their "Daily Budget," in and of itself, constitutes a breach of the AdWords Agreement. The Court finds that this practice is not in and of itself a breach of contract.

The Court denies Google's motion with respect to whether Google's use of the term "Daily Budget," while charging up to 120% of a customer's "Daily Budget," constitutes false advertising in violation of California Unfair Competition Law. The Court finds that this practice may be actionable under § 17200 *et seq*.

The parties shall appear for a Case Management Conference on **June 9, 2008 at 10 a.m.** Pursuant to the Civil Local Rules of Court, the parties shall meet and confer and file a Joint Case Management Statement on or before **May 30, 2008.** The Statement shall inform the Court regarding the posture of the case and the parties' readiness for a class certification hearing.

Dated: May 14, 2008

JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Adel A. Nadji anadji@audetlaw.com
Christopher M. Jhang cjhang@perkinscoie.com
David T. Biderman dbiderman@perkinscoie.com
Judith B. Gitterman gittj@perkinscoie.com
Lester L Levy llevy@wolfpopper.com
Lisa Delehunt Olle lolle@perkinscoie.com
Marc Morris Seltzer mseltzer@susmangodfrey.com
Michele Fried Raphael mraphael@wolfpopper.com
William M. Audet waudet@audetlaw.com

**Dated: May 14, 2008**          **Richard W. Wieking, Clerk**

**By:  /s/ JW Chambers**
      **Elizabeth Garcia**
      **Courtroom Deputy**